## DICKERMAN v. NORTHERN TRUST COMPANY

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SEVENTH
CIRCUIT.

No. 38. Argued April 5, 6, 1899.—Decided January 22, 1900.

A mortgage, given to secure a large number of bonds, provided that the
bonds should become payable if any execution should be sued out against
the property of the company, and such company should not forthwith
pay the same. A bondholder brought suit before a justice of the peace
upon six coupons. The defendant company consented to a judgment
and to the issue of an execution; and upon the same day the trustees
gave notice that, by reason of such execution having been unpaid, they
declared the principal and interest upon all the bonds to be immediately
payable; and at once took possession of the property. *Held*: That,
while these proceedings were taken by connivance and consent of the
parties, they were not collusive in a legal sense, as the debt was honestly
due and the plaintiff entitled to the judgment. *Held, also*: That while
the judgment was obtained for the obvious purpose of enabling the
trustees to declare the mortgage to be due, the court would not inquire
into the motives of the parties.

Where a bill is filed to foreclose a mortgage, and the answer admits the
bonds secured by such mortgage to have been issued, it is not necessary
that the bonds should be put in evidence before a decree of foreclosure
and sale.

Bonds payable " to the bearer, or, when registered, to the registered owner
thereof," and declared to be due on or before a certain date, are negoti-
able, though redeemable by instalments determined by annual drawings.

The fact that the mortgagor corporation may have been organized for the
purpose of creating a trust or unlawful combination in restraint of trade,
is no defence to the mortgage.

The fact that such corporation was organized in pursuance of a fraudulent
scheme to defraud certain stockholders who had contributed their prop-
erties to the capital stock of the corporation, is no defence to a fore-
closure of the mortgage, so far, at least, as the bonds were held by parties
innocent of the fraud.

Promoters of a corporation are bound to the exercise of good faith toward
all the stockholders, to disclose all the facts relating to the property,
and to select competent persons as directors, who will act honestly in
the interest of the shareholders, and are precluded from taking a secret
advantage of other shareholders.

THIS was a bill in equity filed in the Circuit Court for the
Northern District of Illinois by the Northern Trust Company,

a corporation organized under the laws of Illinois having its principal office in Chicago, and Ovid B. Jameson, a citizen of the State of Indiana, as trustees, against the Columbia Straw Paper Company, a corporation organized under the laws of the State of New Jersey, to foreclose a trust deed of some thirty-nine paper mill properties, leaseholds and water powers, situated in thirty-two different counties and in nine different States. This deed, which was dated December 31, 1892, was given to secure the payment of one thousand bonds of the paper company of one thousand dollars each, with coupons bearing interest at six per cent per annum, payable half yearly. These bonds were issued and delivered to one Emanuel Stein, in part payment for the properties acquired by it from him.

The bill, which was in the ordinary form of a foreclosure bill, averred that by the terms of the bonds it was agreed by the paper company that it would redeem, on the first day of December, 1893, one hundred of such bonds, and annually thereafter until December 1, 1901, a similar number, and that the principal of such bonds should become due, if the paper company should make default for a period of three months in the payment of any interest, and an election so to do were given in writing; that by the terms of the mortgage or deed of trust, it should become enforceable, provided default were made in the payment of any one of the bonds which had become due and payable for one month thereafter; or, if default should be made in the payment of interest on any of such bonds, or in the performance of any of the covenants or conditions in the bonds or mortgage, and such default should continue for three months after written demand for payment or performance by the Trust Company, or if a judgment or order should be made, or any effective resolution adopted by the paper company for the winding up of such company, "or if a distress, attachment, garnishment or execution be respectively levied or sued out against any of the chattels or property of either company, and such company shall not forthwith upon such distress, attachment, garnishment or execution being levied or sued out, remove, discharge or pay such distress, attachment, garnishment or execution."

The bill alleged as the only grounds for enforcing the security of the mortgage, (1) that the mortgagor had made default in redeeming or discharging the several amounts of bonds designated in the mortgage and bonds for redemption; (2) in failing to pay certain instalments of interest; and (3) in failing to pay a certain execution sued out on January 22, 1895, against the property of the company upon a judgment obtained against it by one James Flanagan before a justice of the peace of Cook County, Illinois. That by reason of such default complainants had declared the principal and interest of the bonds to be immediately due and payable.

The bill contained the usual prayer for foreclosure and sale, and for a receiver and an injunction against disposing of any of the mortgaged property. The trustees having taken possession of the property, a receiver was appointed by consent of the company upon the same day the bill was filed.

The answer of the paper company admitted the material allegations of the bill, averred its inability to pay its debts, and asserted that the property covered by the mortgage was worth much more than the amount of the bonds and the indebtedness of the company.

A few days thereafter Dickerman, together with others, filed a petition setting forth that they, with other stockholders of the defendant company, had been injured by the wrongful and fraudulent manner in which its securities had been issued; that the defendant and its defence were under the control and direction of the bondholders and their trustees; that the directors were not fitted to conduct the suit by reason of their adverse interests, and prayed to be made defendants and be allowed to plead, answer or demur to the bill, and to file a cross-bill. This was allowed.

Thereupon petitioners filed their answer admitting the execution of the bonds and mortgage, but denying that the bondholders were entitled to the benefit of the trust created by the mortgage; denied that all of the one thousand bonds were duly issued, negotiated and sold, or that they were outstanding and valid obligations of the mortgagor; and also denied that all of such bonds and coupons had come into the posses-

sion of, or were held by, persons who had become the owners
thereof in good faith and for a valuable consideration.

They further set forth in great detail the manner in which
the combination had been formed in the summer of 1892, to
purchase seventy paper mills with their plants, appliances and
good will, by means of securing from their respective owners
option contracts whereby each owner agreed to sell his prop-
erty to the combination for a stated sum in cash, and the
residue in the capital stock of the corporation to be organized,
to which the seventy paper mills, with their properties, etc.,
were to be conveyed; that the corporation so to be formed
was to be capitalized at $3,000,000 of common and $1,000,000
of preferred stock, to be issued at par, in part payment for
the mills at the option prices so obtained, until the whole
amount was exhausted, and that in such contingency the cor-
poration so to be organized was to have the power to issue
$1,000,000 of its bonds to complete the payment for said
mills; that after options had been obtained upon thirty-nine
mills, the total purchase price of which was $2,788,000 in
cash, stock and notes the parties met to consider them, and
decided that it would be necessary to provide $1,000,000 to
purchase the property and furnish the running capital; that
the combination thereupon caused the option contracts to be
transferred to one Emanuel Stein, and then arranged to divide
up and to fraudulently appropriate to themselves $2,113,000
of the capital stock of the proposed corporation, which would
not be required to pay for the thirty-one mills which were
left out of the combination.

That after having arranged how many of the one thousand
mortgage bonds of the new corporation each member of the
combination was to receive for an equal amount in cash, and
how many shares of preferred and common stock each was to
receive gratuitously with bonds, they caused articles of incor-
poration to be filed December 6, 1892, in the State of New
Jersey, to organize the paper company with a capital stock of
$4,000,000, with themselves and their agents as directors.
That on December 14, 1892, they procured Stein, who held
the option contracts for the purchase of the thirty-nine mills,

to present to the stockholders a proposition to secure the titles to the thirty-nine mills, and to convey the same to the new corporation for $5,000,000, as follows: $1800 in cash; $1,000,000 in first mortgage bonds; $1,000,000 in preferred and $2,998,200 in the common stock of the new company; that this proposition was accepted by the stockholders and also by the directors, and the property conveyed to the company; the bonds and capital stock divided among the members of the combination, as had been previously arranged, and that such persons still owned and were still liable for their capital stock in a much larger amount than the bonds of the company; and that the latter were owned by the same persons, who were liable on their stock. That the Columbia Straw Paper Company having been organized for the purpose of taking such conveyances, and thus consolidating said mill plants, their contention was, that by reason of fraudulent overvaluation of the various mill plants and properties upon which options of purchase had been taken, a defence in the nature of a set-off existed in favor of the company against such bondholders as were also stockholders to the extent of the unpaid part of the stock held by them.

The answer also contained an averment that the judgment and execution in favor of Flanagan before a justice of the peace was a fraudulent and collusive act on the part of the managers of the defendant company, in order to give the trustees the right to begin this foreclosure proceeding; that in pursuance of this the directors had fraudulently neglected and refused to pay six interest coupons on the bonds owned by Flanagan, in order that a suit might be instituted thereon; that the defendant corporation appeared upon the return of the summons, consented to an immediate trial, made no defence, but allowed judgment to be entered and an execution to issue on the same day, and that the firm of lawyers who had devised this proceeding acted as solicitors for the trustees in filing the bill of foreclosure. It was denied that the Straw Paper Company was insolvent, and was averred that the complainants and others had combined to wreck the company and defraud the defendant stockholders by withdrawing from

the treasury of the company bonds and stock to the value of $3,000,000, which the complainants held in trust for the company, and that the same are assets and not liabilities, as in the bill of complaint alleged.

Defendants also filed a cross-bill for an accounting in respect of the transactions complained of, especially in reference to the issue of the alleged mortgage bonds and the preferred and common stock; and if, on such accounting, anything should appear to be due from any of the defendants to the Straw Paper Company, a decree might be entered for the payment of the same, and that the receiver theretofore appointed might be removed and a proper and practical person be appointed receiver in his stead, with power to take possession of the property, as well as of the books, papers and writings of the Columbia Straw Paper Company, and that an injunction issue restraining the officers and directors of the company from interfering with his possession. The cross-bill was subsequently stricken from the files.

Defendants later amended their answer, alleging that the bonds and mortgage were part of an illegal scheme to create a monopoly, regulate prices and prevent competition among the mills purchased, who had, prior to the consolidation, been in active competition with each other.

The case was referred to a master to take proofs and report the testimony. He reported that the material allegations of the bill were sustained by the proofs; that all of the one thousand bonds, set up in the bill, were negotiated and sold and were outstanding and valid obligations of the company; that the company made default in redeeming the first one hundred bonds, maturing December 1, 1893, as well as one hundred and five bonds maturing December 1, 1894; that the company also made default in the payment of interest upon its bonds due June 1, and December 1, 1894, though the same was duly demanded; that by reason thereof, and of the execution obtained by Flanagan, the complainants declared the principal and interest of the entire issue to be immediately due and payable; that they had been requested in writing by the holders of more than one third of the bonds to enforce the provisions of

the deed of trust; that the company had been for some time and was still insolvent; that at the date of the report there was due upon the bonds, principal and interest, $1,249,632.86; that the contention of the defendants, that the bonds were not issued and outstanding, was not supported by the testimony; that the contention, that the stock of the company, which passed into the hands of Emanuel Stein by virtue of his contract with the company, was not fully paid-up stock, was also not supported, that as a matter of fact such stock was received by Stein as fully paid stock, and that as a matter of law no question in regard to it between the stockholders of the company could be inquired into in this proceeding. He further found that there were no creditors of the company except those represented in this suit.

The defendant stockholders, who were complainants in the cross-bill, filed exceptions to this report, which, upon a hearing by the court, were overruled, and a decree of sale *nisi* entered in favor of the original complainants. *Northern Trust Co.* v. *Columbia Straw Paper Co.*, 75 Fed. Rep. 936. On appeal to the Circuit Court of Appeals for the Seventh Circuit the decree of the Circuit Court was affirmed. 53 U. S. App. 270. Whereupon the appellants applied for and were granted a writ of certiorari from this court.

*Mr. Otto Gresham* and *Mr. John S. Cooper* for Dickerman.

*Mr. Louis Marshall* for the Trust Company. *Mr. Charles A. Dupee* and *Mr. Monroe L. Willard* were on his brief.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

This case presents primarily the question whether a minority of the stockholders of a corporation have a right to intervene in the foreclosure of a mortgage upon the corporate property for the purpose of showing that the property was sold to the corporation by the connivance of the mortgagees at a gross overvaluation, and to compel the bonds held by them to be

subjected to a set-off of their indebtedness to the corporation for unpaid stock.

It should be borne in mind in connection with the several defences set up by the intervenors that they do not appear here in the capacity of creditors, but as stockholders; that their rights are the rights of the corporation and must be asserted and enforced through the corporation, and upon the theory that the latter has or threatens, by collusion or otherwise, to neglect the proper defence of the foreclosure suit. *Dodge* v. *Woolsey,* 18 How. 331, 341, 343; *Koehler* v. *Black River Falls Iron Co.,* 2 Black, 715; *Bronson* v. *La Crosse &c. Railroad,* 2 Wall. 283; *Davenport* v. *Dows,* 18 Wall. 626; *Dewing* v. *Perdicaries,* 96 U. S. 193; *Hawes* v. *Oakland,* 104 U. S. 450, 460; *Greenwood* v. *Freight Co.,* 105 U. S. 13; *Detroit* v. *Dean,* 106 U. S. 537; Cook on Stockholders, §§ 645, 659, 750.

There are several preliminary objections made by the intervenors to this foreclosure which require to be disposed of before entering upon the proper merits of the case. They are —

1. That the bonds were not due. This in a certain sense is true. The bonds were peculiar in this respect: There was no date fixed for their maturity, but there was a provision that on the first day of December, 1893, and upon the same date in every succeeding year, the company would redeem a certain number of bonds to be ascertained by drawings made under the direction of the Northern Trust Company in the month of November in each year. That immediately after such drawing the company should cause the numbers of the bonds drawn for redemption to be published in New York and Chicago newspapers, and that every bond so drawn should become redeemable on the first day of December next thereafter. There was no evidence that any such drawing was ever made, and the Trust Company did not institute their foreclosure proceedings upon the theory that any of the bonds, by their terms, had matured.

There was, however, a provision that the mortgage should become enforcible, if the trustees should declare the princi-

pal and interest upon the bonds to be immediately payable, after any execution should be levied or sued out against the chattels or property of the company, and such company should not forthwith, upon such execution being levied or sued out, remove, discharge or pay the same.

It appears that one James Flanagan, who was a bondholder, brought suit against the company on January 22, 1895, upon six coupons. The action appears to have been brought directly or indirectly through the legal firm who were also counsel of the defendant company. Summons was issued, returnable January 28, 1895, and served upon the president of the company at five o'clock P.M. on the day it was issued (22d). On the same afternoon, the president appeared before the justice of the peace and consented to an immediate trial, which resulted in a judgment for $180. Execution being sworn out, it was issued and placed in the hands of the constable at about half-past five o'clock of the same day. Later on the same day the trustees gave notice to the company that by reason of such execution having been unpaid, they declared the principal and interest upon the one thousand bonds named and described in the trust deed to be immediately payable, and upon the same night the trustees took possession of the property of the company in the vicinity of Chicago, the officers and agents of the company making no resistance. It also appeared that the president of the company had been in consultation with the attorneys of the trustees about foreclosing the mortgage and taking possession of the property, for several days prior to January 22.

Upon this state of facts the master, to whom the case was referred, reported that the contention of the defendants, that the procurement of the Flanagan judgment was the result of a collusion of the company, was not supported by the testimony. This was also the opinion both of the Circuit Court and of the Court of Appeals.

We have no doubt that this judgment was collusive in the sense that it was obtained by the plaintiff and consented to by the defendant company for the purpose of giving the trustees a legal excuse for declaring the principal and interest of

the mortgage to be due, and to give authority for a foreclosure. But this did not constitute collusion in the sense of the law, nor does it meet the exigencies of the petitioners' case. Collusion is defined by Bouvier as "an agreement between two or more persons to defraud a person of his rights by the forms of law, or, to obtain an object forbidden by law," and in similar terms by other legal dictionarians. It implies the existence of fraud of some kind, the employment of fraudulent means, or lawful means for the accomplishment of an unlawful purpose; but if the action be founded upon a just judgment, and be conducted according to the forms of law and with a due regard to the rights of parties, it is no defence that the plaintiff may have had some ulterior object in view beyond the recovery of a judgment, so long as such object was not an unlawful one. In *Morris* v. *Tuthill*, 72 N. Y. 575, which was also a suit to foreclose a mortgage, the court observed: "The facts that the assignor of a mortgage and his assignee acted in concert with a view unnecessarily to harass and oppress the mortgagor, and with intent to prevent payment, to the end that the equity of redemption might be foreclosed, and they become purchasers for less than the value, do not constitute a defence to an action to foreclose a mortgage. So, also, the the facts that the assignee took title from motives of malice, and solely with the view to bring an action, and that the assignor assigned from a like motive, and without due consideration, furnish no defence, and do not impeach plaintiff's title. It is sufficient to sustain the action that the mortgage debt is due, has been transferred to and is owned by plaintiff; and the mortgagor can only arrest the action by paying or tendering the amount due."

If the law concerned itself with the motives of parties new complications would be introduced into suits which might seriously obscure their real merits. If the debt secured by a mortgage be justly due, it is no defence to a foreclosure that the mortgagee was animated by hostility or other bad motive. *Davis* v. *Flagg*, 35 N. J. Eq. 491; *Dering* v. *Earl of Winchelsea*, 1 Cox Ch. 318; *McMullen* v. *Ritchie*, 64 Fed. Rep. 253, 261; *Toler* v. *East Tenn. &c. Railway*, 67 Fed. Rep. 168.

Now, in this case there is no doubt that Flanagan's claim was an honest one; that the coupons upon which he brought the suit were due and unpaid, and there is nothing to show that he would not have been entitled to a judgment upon them if the defendant had made a contest. The company was notoriously insolvent. Its coupons for 1894 and 1895 were unpaid. All its property was subject to the mortgage given to secure its bonds. It could no longer continue its business. Flanagan had a perfect right to bring suit, and under these circumstances the president of the company was guilty of no wrong in consenting to a judgment and to the immediate issue of an execution. The company was not bound to defend if there were no defence. The forms of law were complied with. It would doubtless have been more seemly if judgment had not been entered until the return day of the summons, if the execution had not issued until the expiration of the twenty days allowed by law, and if the trustees had not been so alert in seizing upon the non-payment of the judgment as an excuse for declaring the principal and interest of the bonds to be due. But this haste did not render the judgment or execution void. If the company had become insolvent and could no longer carry on its business, it was not only its legal obligation, but its moral duty, to surrender the mortgaged property to the mortgagees, in order that the latter might protect their interests. If the corporation saw fit to consent to a foreclosure, a minority of stockholders cannot question their right to do so. The fact that the Flanagan action was undertaken for the purpose of enabling the trustee to declare the principal and interest due does not invalidate the proceeding so long as there was a debt due, an action properly conducted to recover it, and the object to be gained was not an illegal one.

The reports of this court furnish a number of analogous cases. Thus, it is well settled that a mere colorable conveyance of property, for the purpose of vesting title in a nonresident and enabling him to bring suit in a Federal court, will not confer jurisdiction; but if the conveyance appear to be a real transaction, the court will not, in deciding upon the

question of jurisdiction, inquire into the motives which actuated the parties in making the conveyance. *McDonald* v. *Smalley*, 1 Pet. 620; *Smith* v. *Kernochen*, 7 How. 198; *Barney* v. *Baltimore*, 6 Wall. 280; *Farmington* v. *Pillsbury*, 114 U. S. 138; *Crawford* v. *Neal*, 144 U. S. 585.

The law is equally well settled that, if a person take up a *bona fide* residence in another State, he may sue in the Federal court, notwithstanding his purpose was to resort to a forum of which he could not have availed himself if he were a resident of the State in which the court was held. *Cheever* v. *Wilson*, 9 Wall. 108, 123; *Briggs* v. *French*, 2 Sumn. 251; *Catlett* v. *Pacific Ins. Co.*, 1 Paine, 594; *Cooper* v. *Galbraith*, 3 Wash. 546; *Johnson* v. *Monell*, Wool. 390. So, also, in cases where a surety attacks a judgment against his principal upon the ground that it was obtained for the purpose of defrauding him, it must be made to appear either that no debt existed against the principal, or that the amount was grossly exaggerated for the purpose of defrauding the surety. *Parkhurst* v. *Sumner*, 23 Vermont, 538; *Annett* v. *Terry*, 35 N. Y. 256; *Dougherty's Estate*, 9 Watts & S. 189; *Thompson's Appeal*, 57 Penn. St. 175; *Willard* v. *Whitney*, 49 Maine, 235; *Pierce* v. *Jackson*, 6 Mass. 242; *Great Falls Mfg. Co.* v. *Worster*, 45 N. H. 110; *Berger* v. *Williams*, 4 McLean, 577; *Feaster* v. *Woodfill*, 23 Indiana, 493. So, too, it has been held that a person may purchase stock in a corporation for the very purpose of bringing a stockholder's suit, and that the law will not inquire into the motive which actuated his purchase. *Bloxam* v. *Met. Railway*, L. R. 3 Ch. App. 337; *Seaton* v. *Grant*, L. R. 2 Ch. App. 459; *Elkins* v. *Camden & Atlantic Railroad*, 36 N. J. Eq. 5.

In this connection it is claimed that the Trust Company was premature in declaring the principal and interest of the mortgage to be due, although the mortgage provided that such declaration might be made if the company should not "forthwith," upon execution being sued out, discharge or pay it. It is insisted that the company was entitled to a reasonable time in analogy to certain cases which hold that in insurance companies the word "forthwith" carries this signifi-

cance. But "forthwith" is defined by Bouvier as indicating that "as soon as by reasonable exertion, confined to the object, it may be accomplished. This is the import of the term. It varies, of course, with every particular case." In matters of practice and pleading it is usually construed, and sometimes defined by rule of court, as within twenty-four hours. Anderson (Law Dict.) says of the word that it "has a relative meaning, and will imply a longer or shorter period, according to the nature of the thing to be done." There are many cases which turn upon the question whether a person was not too late in complying with a requirement that a thing must be done forthwith, but we can recall none where he has been held in default for doing such act too speedily, and as the corporation in this case made no objection to an instant declaration by the trustees that they would treat the principal and interest of the mortgage as due, it was not within the power of the appellants to set up the fact that they acted with too great haste. It is one of those matters within the discretion of the directors, and we do not think the appellants are in a position to impugn their judgment. *Railway Co.* v. *Alling*, 99 U. S. 463, 472; Cook on Stockholders, § 750. Possibly the mortgagor or the unsecured creditors of the mortgagor might have had some reason to complain, but, so far as the mortgagees are concerned, the action seems to have been taken in their interest and to have redounded to their benefit.

2. That the bonds were not put in evidence prior to the decree of foreclosure and sale. This objection is unsound. The foreclosure suit was by mortgagees in possession. The bill averred and the answer of the company admitted the issue of one thousand bonds of one thousand dollars each, with the accompanying interest coupons, and the answer of the intervenors admitted that these bonds were issued and certified by the Trust Company, and only denied that *all* of them were duly issued, negotiated and sold, and that they were valid and outstanding obligations. The testimony for both parties showed that the entire number were certified and issued by the company, and the master also made a finding to the same effect. He also found that they were valid

obligations of the company, and that there was due thereon $1,249,632.86. Given the number of bonds and coupons, the amount due was a simple matter of mathematical computation. No further proof was required to justify a decree of foreclosure and sale. Nothing could be gained by an order to produce the bonds before the master prior to such decree. The complainants were trustees under the mortgage, and had no personal interest in the bonds, but held the legal title to the mortgage, which they were foreclosing for the benefit of others. This power was expressly given them by the mortgage. It was sufficient to prove that the bonds were valid and were outstanding obligations of the company, and it was not necessary to show in whose hands they were or to require their production. Indeed, an order to that effect could only result in delaying a decree indefinitely, since in cases of corporate mortgages the bonds are often widely scattered, owned in foreign countries, or by persons totally ignorant that a suit for foreclosure is in progress. Months and even years might be required to produce them all. The practice has been to order a decree for foreclosure and sale without their production. *Guarantee Trust Co.* v. *Green Cove Railroad,* 139 U. S. 137, 150; *Toler* v. *East Tenn. &c. Railway Co.,* 67 Fed. Rep. 168, 180.

When, after a sale, the case is referred to a master for proof of claims against the proceeds of sale, they must of course be brought into court for payment and cancellation, and the title of each holder must then be proved.

3. That the bonds were not negotiable. This objection is also unsound. The bonds were payable " to the bearer, or, when registered, to the registered owner thereof;" were declared to be due on or before December 1, 1901, and were redeemable by annual drawings conducted under the supervision of the Trust Company. It was not known which bonds it would redeem in any one year, as this was to be determined by drawings; but its promise was to redeem all of them before December 1, 1901. Considering the nature of corporate bonds, and the difficulty of redeeming so large a number and amount upon any one day, we do not think the fact that they were

redeemable by instalments, determined by drawings, impaired their negotiability. Promissory notes much more indefinite as to their time and payment have been held to be negotiable, *Stevens* v. *Blunt*, 7 Mass. 240; *Goodloe* v. *Taylor*, 3 Hawks, 458; *Cota* v. *Buck*, 7 Metc. 588; and in *Goshen &c. Turnpike Road* v. *Hurtin*, 9 Johns. 217, it was held directly " that a promise in writing to pay a certain sum " in such manner and proportion, and at such time and place, as he shall from time to time require, is a promissory note.

It is at least doubtful whether the fact that these bonds were or were not negotiable is a material one; but assuming it to be such, we think they were negotiable within the meaning of the law.

4. That the Circuit Court should have allowed the answer to be amended for the purpose of showing that the organization of the defendant company, and the execution of the bonds and mortgage, were parts of a scheme to form a trust or unlawful combination in restraint of trade. After the answer of the defendant company and the original answer of the appellants — who had been admitted as defendants by leave of court — were filed, and all the proofs had been taken, appellants filed an amendment to their answer, setting up that the bonds and mortgage were parts of a combination or trust in restraint of trade, and in direct violation of the act of Congress of July 2, 1890, " to protect trade and commerce against unlawful restraints and monopolies," and also in violation of the act of the general assembly of Illinois " to provide for the punishment of persons, partnerships or corporations forming trusts, pools and combines, and mode of procedure and rules of evidence in such cases," approved June 11, 1891. The answer set out the facts at length, averring that there were seventy mills engaged in the manufacture of straw paper, all in competition with each other, and that the company obtained control of forty of the mills and operated sixteen. This amended answer was filed without objection from court or counsel, and still remains as part of the pleadings in the case.

Prior, however, to this amendment being filed, and on January 10, 1896, Charles A. Miller filed his petition to be

made a party defendant and to set up the trust or monopoly defence. His petition, which sets out with great particularity his theory of a trust, was with its affidavits and all the testimony in the case submitted to the court, carefully examined and finally denied.

But admitting everything that can be claimed for the combination in this connection, we do not see how it can affect materially the foreclosure of this mortgage. If this were a proceeding in *quo warranto* to attack the organization of the corporation, or an indictment under the statute of Illinois, or an action against a member of the combination to enforce any of the provisions of the original contract, the validity of such contract would become an important question. But in a suit to foreclose a mortgage upon the property of the concern, it is difficult to see how the purpose for which the corporation was originally organized can become a material inquiry. So long as the corporation existed, it had the power to create a mortgage, and when that mortgage became due the trustee had a right to foreclose. This trustee was no party to the alleged combination, and the fraud, if any existed, was wholly extrinsic to the mortgage. It would seem a curious defence if a mortgagor could set up against the mortgage that the property covered by it was used for an illegal purpose unknown to the mortgagee, as, for instance, gambling, and therefore that the mortgage was invalid.

5. That the court erred in holding that the evidence did not support the contention of the petitioners, that there is a liability, enforcible in this cause, against the bondholders holding stock that is not paid for, to the Columbia Straw Paper Company, amounting to $2,113,000, and which indebtedness should be set off against the indebtedness on each bond. This proposition involves the real merits of the case. The gravamen of the petitioners' contention is that the bondholders should be held for the difference between the amount paid by Stein for the thirty-nine mill properties, namely, $1,887,000 of stock, and the amount for which he subsequently turned them over to the paper company, namely, four millions of dollars in stock, the difference being $2,113,000.

In support of this contention petitioners introduced evidence of the following facts:

In October, 1892, there were about seventy straw paper mills doing business in the Northwestern States, and having a practical monopoly of the manufacture of straw paper.

Some efforts had been made to combine them in a single corporation, but they had proven unsuccessful, when, in February, 1892, the scheme was revived by one Stein, who represented a firm of New York capitalists; certain other capitalists in Buffalo, who were represented by one Beard, and still others in Chicago.

As the result of certain conferences between Stein and some others who had previously endeavored to obtain options, Philo D. Beard and Thomas T. Ramsdell undertook to obtain options for the purchase of these mills, to be turned over to a corporation to be organized by Beard and Ramsdell with a capital stock of $4,000,000. The options did not specify the number of mills that were to join, although it seems to have been understood that the entire seventy were to be gotten in if possible, but as a matter of fact Beard and Ramsdell obtained options upon only thirty-nine. The options show clearly that it was intended to turn the properties over to the new corporation. For these properties they agreed to pay $2,788,000, part in cash ($766,000), part in preferred stock ($629,000), part in common stock ($1,258,000) and part in notes ($135,000) of the new company. The stock payments thus aggregated $1,887,000.

Instead of calling the mill owners together and organizing a new corporation, Beard and Ramsdell turned over the options to Stein; and articles of incorporation were drawn by a member of the New York firm under the laws of New Jersey, which were executed by Beard, one Taylor, a clerk in the office of the New York firm, and one Heppenheimer, a New York lawyer residing in New Jersey, each of these subscribing for four shares, aggregating twelve shares out of a total issue of 40,000 shares. These articles of incorporation were filed in the office of the Secretary of State on December 6, 1892. The three incorporators met immediately in Hoboken as stockholders, and elected themselves as directors with six

others, two of whom were members of the New York firm, and the others clerks in their office. Not a single mill owner who expected to become a stockholder was placed on the board at this time, although representations had been made by the syndicate that a majority of the stockholders would be mill owners. Philo D. Beard was elected president and Samuel H. Guggenheimer secretary.

Immediately thereafter, and on December 10, 1892, Stein, who held all the options, assuming to act as an independent owner, though he had obtained the options for the benefit of the company, and had promised to pay for them in the stock of the company, made a proposition in writing drawn by a member of the New York firm to this board of directors to sell the thirty-nine mills to the paper company for $5,000,000, being an advance of $2,113,000 over what he had agreed to pay for them. This proposition was drafted by the New York firm, and the stockholders upon the day the proposition was received had another meeting and instructed themselves as directors to accept. They authorized Beard as president to enter into a contract with Stein, which was accordingly done. Stein and wife acknowledged it before a clerk in the office of the Chicago firm.

This board of directors served for only two weeks, when they were succeeded by another board composed of Beard, Stein, Heppenheimer and others mostly in their interest.

For the next month the members of the Chicago firm were busy in getting the mill owners to deposit their title deeds and abstracts, but nothing appears to have been said to them of what had occurred in New York. The New York firm engaged itself in raising money to pay for the bonds, and deposited over $800,000 with the Trust Company, to be disbursed to the mill owners, which money should be checked out by its personal agent, who proceeded to make settlements with the mill owners and take over their properties by giving cheques payable to Stein, who indorsed them over. Stein testified that he did not understand the plan, but left everything to an agent to attend to, though it involved Stein paying out one million in cash and four millions in stock. The

principal parties in interest did not seem to trust Stein, and attended to the payment of the purchase price themselves.

It appears that 957 shares of preferred and 4441 shares of common stock went directly into the hands of Beard; 859 shares of the preferred and 4357 shares of common stock to the New York firm; to the friends of this firm 420 shares of preferred and 840 shares of common stock; to the Chicago firm, 172 shares of preferred and 515 shares of common; to a trustee, 1110 shares of preferred and 2232 shares of common; to Stein, himself, 270 shares of preferred and 2377 shares of common. No money consideration passed from Stein or from any of these parties to the company for any of this stock.

It thus appears that the syndicate received 3788 shares of preferred and 14,751 shares of common stock from the treasury of the company, aggregating 18,459 shares of the par value of $1,854,900. As it took but $1,887,000 of the stock at par to acquire the mills, this leaves $258,100 unaccounted for. This is explained in the testimony of Sherwood, where he says that this stock went to the promoters and their friends. Add this $258,100 to the $1,854,900 above stated, and it amounts to $2,113,000, which is the total capitalization of $4,000,000, less the $1,887,000 that went to the mill owners.

As thus organized the corporation began business. It raised the price of paper six dollars a ton, which invited competition, and a new corporation was organized by the New York firm under the laws of New Jersey, called the Paper Commission Company. The sole function of this company was to sell the product of the Straw Paper Company, and the other paper mills which had not given options, the Straw Paper Company paying the new company a commission of twenty-five per cent for selling all its paper, reducing the net price realized by the Straw Paper Company to less than it had obtained when selling its own paper.

The mill owners, although the largest stockholders, never seem to have been treated as a factor in these operations, and in some way or other the syndicate got possession of $2,113,000 in stocks and bonds, which they appeared to have used in furtherance of their own interests.

From this testimony it would appear:

(1.) That the options were to be secured for the benefit of a corporation to be organized by Beard and Ramsdell; and that the mill owners were to be paid principally in the stock of such corporation;

(2.) That Stein, the successor of Beard and Ramsdell, had no title personally to the property he pretended to sell, but that he held it as trustee for the corporation to be organized;

(3.) That the corporation was organized by three parties who held but twelve shares out of forty thousand shares, one of the three being a clerk in the office of the New York firm and the other two acting in their interest;

(4.) That a member of the New York firm drew the proposition by which Stein offered to sell these properties to a corporation, in which the member himself was the only responsible stockholder;

(5.) That the owners of the mill properties knew nothing of the organization of the corporation, or of its acceptance of Stein's proposition to sell his properties to the Straw Paper Company;

(6.) That the stock was fixed at $5,000,000 upon the idea that seventy mills would join in the combination, but as a matter of fact only thirty-nine joined; that but $2,788,000 was paid for these properties, and that $2,113,000 of stock was distributed among the parties who got up the corporation without any distinct consideration being received;

(7.) That the mill owners received stock which was worth but one half the value of that which they supposed they would receive.

Assuming these facts to have made out a case of fraud in the organization of the Straw Paper Company, and in the purchase of the mill properties, it is difficult to see how they affect the validity of the bonds as a whole, the right of the trustee to foreclose, or how they can entitle the complainant to compel the bondholders, so far at least as they were innocent holders, to set off their indebtedness to the paper company for stock, against the indebtedness of the company upon the bonds.

The company did, in fact, go through the form of an organ-

ization under the laws of the State of New Jersey, and while the first board of directors seem to have been mere tools in the hands of the New York firm with no real interest in the company, they appear to have conformed to the letter of the law, and until formally dissolved the corporation had a legal existence. As thus organized it accepted a proposition from Stein to purchase the mills for $5,000,000, namely, $1800 in cash; $1,000,000 in bonds; $1,000,000 in preferred stock, and $2,998,200 in common stock of the paper company, "all of which," both preferred and common, "shall be fully paid and unassessable, and so expressed on the face of the certificates." It thus appears that the entire transaction by which the title of the thirty-nine mills was finally vested in the Straw Paper Company was accomplished through three distinct transfers: First, from the several owners of these properties to Beard and Ramsdell; second, by assignment from Beard and Ramsdell to Stein; and, third, from Stein to the paper company. It also appears that when the mortgage was made, the legal title to the property was in the Straw Paper Company; and that, whatever be the circumstances connected with the organization of the company and the transfer from Stein, it had the legal right to make this mortgage. The master found that all of this issue of $1,000,000 in bonds was negotiated and sold, and is now outstanding, and a valid obligation of the paper company; that they are the same bonds described in the mortgage, and that they are now due and unpaid. The original options given by the owners of the mill properties provided that $766,000 should be paid in cash, and in the facts above stated it appears that a member of the New York firm engaged himself in raising money to pay for the bonds, and deposited over $800,000 with the Trust Company to be disbursed to the mill owners.

The testimony also showed that the bonds were all paid for in full, and there is no testimony to the contrary. The decree of the Circuit Court also found that all of the bonds were duly issued, negotiated and sold, and were outstanding and valid obligations of the company, and the affirmance of that decree by the Court of Appeals showed that also to be its

finding. A list of the parties to whom the bonds were delivered by the Northern Trust Company upon the request of the Straw Paper Company shows that nearly all the bonds were originally issued to Samuel Untermeyer, Philo D. Beard, John D. Hood, to members of the Chicago firm, and others more or less connected with the organization of the company. But the testimony shows that far the larger part of them had been transferred to other parties, presumably for the purpose of raising the $800,000 deposited with the Trust Company. There is nothing to impugn the good faith of most of these holdings. It is true that these parties, in disposing of the bonds, allowed to each purchaser of a one thousand dollar bond two hundred dollars of preferred and four hundred of common stock, but they did not seem to have profited by this themselves. And if it were necessary to the negotiation of the bonds to give a *bonus* in stock, it cannot be considered in the light of a mere donation. Nor, if it were done in good faith, would it necessarily afford a ground of complaint to dissenting stockholders. *Graham* v. *Railroad Co.*, 102 U. S. 148. Certainly, if this *bonus* were received in ignorance of the fraud practised upon the original mill owners, and simply as an inducement to take the bonds, the dissenting stockholders could not compel the bondholders to submit to a deduction from their bonds of the par value of the stock received as a *bonus*, particularly in view of the fact that the stock might turn out to be worthless.

In addition to this, however, the contract with Stein provided that the stock to be issued to him should declare upon the face of the certificates to be fully paid and unassessable, and we know of no principle upon which it can be held that innocent bondholders can be required to deduct from the face of their bonds the amount unpaid upon their stock. The very authorities which hold that the declaration that the stock is fully paid and unassessable is not binding upon creditors, also hold that the corporation cannot repudiate it and proceed to collect either from the person receiving the stock or his transferee the unpaid part of the par value. Thus in *Scovill* v. *Thayer*, 105 U. S. 143, 153, in which a similar declaration was

held to be invalid against creditors, it was said: "The stock held by the defendant was evidenced by certificates of full-paid shares. It is conceded to have been the contract between him and the company that he should never be called upon to pay any further assessments upon it. The same contract was made with all the other shareholders, and the fact was known to all. As between them and the company this was a perfectly valid agreement. It was not forbidden by the charter or by any law or public policy, and as between the company and the stockholders was just as binding as if it had been expressly authorized by the charter."

There is no doubt that, if this were a suit by creditors to enforce payment of the unpaid portion of the stock subscription, the fact that the stock certificates declared that they were fully paid and unassessable would be no defence; but it is a suit of stockholders in the right of the corporation, and as between the corporation and its stockholders the declaration that the shares are fully paid up and unassessable is a valid one. If an action by the corporation would not lie to recover the unpaid part of the subscription, then such unpaid part cannot be deducted from the bonds.

Somewhat different considerations apply to those who took part in the organization of the company, and in the purchase of the thirty-nine mills, and who received the bonds and stock of the paper company with notice of the fraudulent character of the scheme. We are not disposed to condone the offences of those who, through Beard and Ramsdell and their assignee, Stein, as their agents, purchased these plants for $2,788,000, and immediately thereafter went through the form of repurchasing of their own agents (in fact, of themselves) the same properties at $5,000,000. These men stood in the light of promoters of the Straw Paper Company. A promoter is one who "brings together the persons who become interested in the enterprise, aids in procuring subscriptions and sets in motion the machinery which leads to the formation of the corporation itself." Cook on Stock and Stockholders, sec. 651. Or, as defined by the English statute of 7 & 8 Vict. chap. 110, sec. 3, "every person acting, by whatever name, in the form-

ing and establishing of a company at any period prior to the company " becoming fully incorporated. See also Lloyd on Corporate Liability for Acts of Promoters, 17. He is treated as standing in a confidential relation to the proposed company, and is bound to the exercise of the utmost good faith. Lloyd, Corporate Liability, 18; *Densmore Oil Co.* v. *Densmore,* 64 Penn. St. 43; *Bosher* v. *Land Co.,* 89 Virginia, 455. The promoter is the agent of the corporation and subject to the disabilities of an ordinary agent. His acts are scrutinized carefully, and he is precluded from taking a secret advantage of the other stockholders. Cook on Stock and Stockholders, sec. 651. " Accordingly, it has been held that, if persons start a company, and induce others to subscribe for shares, for the purpose of selling property to the company when organized, they must faithfully disclose all facts relating to the property which would influence those who form the company in deciding upon the judiciousness of the purchase. If the promoters are guilty of any misrepresentation of facts, or suppression of the truth in relation to the character and value of the property, or their personal interest in the proposed sale, the company will be entitled to set aside the transaction or recover compensation for any loss which it has suffered." Morawetz on Corporations, secs. 291, 294, 546; *New Sombrero Phosphate Co.* v. *Erlanger,* 5 Ch. Div. 73; *Bagnall* v. *Carlton,* 6 Ch. Div. 371; *Emma Silver Mining Co.* v. *Grant,* 11 Ch. Div. 918.

" In those cases where the scheme of organization gives the promoters the power of selecting the directors who are to represent the company in the proposed purchase, they are bound to select competent and trustworthy persons who will act honestly in the interest of the shareholders. A purchase made from the promoters under these circumstances will not bind the company unless it was a fair and honest bargain." Morawetz on Corp. sec. 546; *The New Sombrero Phosphate Co.* v. *Erlanger,* L. R. 5 Ch. Div. 73; *Brewster* v. *Hatch,* 122 N. Y. 349; *Simons* v. *Vulcan Oil & Mining Co.,* 61 Penn. St. 202; *Twycross* v. *Grant,* L. R. 2 C. P. Div. 469, 503; *Whaley Bridge Calico Printing Co.* v. *Green,* L. R. 5 Q. B. Div. 109, 111; Thompson on Liability of O. & A. 218, sec. 20.

It is true that the options were taken from each owner of the thirty-nine mill plants severally, and that no mention was made of the number that were to be taken into the new corporation. But each option contract showed that it was the purpose of Beard and Ramsdell to organize one or more corporations with a capital of one million preferred and three millions of common stock, and with a bonded indebtedness of one million dollars. This clause of itself, as well as the whole scheme of the contract, indicates that a large number of similar options were to be obtained, and that one or more large corporations was to be organized to conduct the business. It goes without saying that it never could have been contemplated that any one or any small number of these mills, which were comparatively insignificant affairs, were to be reorganized with a capital stock of four million dollars. The oral testimony indicates that it was the understanding that all the straw paper mills in that section of the country, some seventy in number, were to be consolidated into the new corporation, and such upon the testimony before us would appear to be the fact. Now, if it were understood by the owners of these thirty-nine mills, who received in cash and stock $2,788,000 for their plants, that Beard and Ramsdell, who held themselves out in the option contracts as promoters of the new corporation, were to transfer these options to Stein, and that the latter was to set himself up as a purchaser and resell these properties to the new corporation for $5,000,000, it is impossible to suppose that they would have consented to the arrangement. Bound as these promoters were to deal fairly and honestly with the stockholders in the new corporation, they were guilty of apparently inexcusable conduct in excluding the mill owners from all participation in organizing the new corporation, putting in their own clerks as directors, and paying off the mill owners in stock which was really of little more than half the value they must have expected to receive. If they were unable to obtain options upon only thirty-nine out of the seventy mills, they should have made known this fact, or at least given these mill owners the benefit of the surplus stock. Of course, they were entitled to charge

a reasonable sum for their services and expenses, but the parties who represented the substantial interests in the new corporation were entitled to be informed of the steps taken. We think that no acquaintance with legal principles was necessary to apprise these parties that they were not dealing fairly with the owners of the mills in concealing from them the facts connected with this purchase, and in dealing with the property as if they themselves were the only parties in interest.

It is difficult, however, to see how justice can be done by a reversal of the decree appealed from. This is a decree ordering a foreclosure and sale of the property to pay the bonds, to which the bondholders are clearly entitled. It finds that all the bonds were duly issued, negotiated and sold, and that they are outstanding and valid obligations of the company, and that they are now held by a large number of persons who have become the owners thereof for a valuable consideration. These bonds must ultimately be presented for redemption from the proceeds of sale, and we see nothing in the decree appealed from to prevent an inquiry being instituted as to their validity in the hands of their present holders. We are clearly of opinion that, so far as they were purchased for a valuable consideration by innocent holders, they are not subject to the set-off claimed. The question whether, so far as they are held by parties cognizant of the alleged fraud, they are subject to a set-off, is not one which properly arises in this case, where the bonds must be treated as an entirety, but is a defence applicable to each individual bondholder. Whether the corporation, or those who sue in its behalf, may hold them liable for the par value of the stock or are confined to a rescission of the transaction, is a question upon which we express no opinion.

*We are therefore of opinion that the decree of foreclosure and sale appealed from must be affirmed.*

MR. JUSTICE SHIRAS and MR. JUSTICE PECKHAM concurred in the result, but were of opinion that the question of fraud was irrelevant to the issue.