## Hunter et al. v. Board of Education of Floyd County.

(Decided June 23, 1936.)

164

WALTER S. HARKINS, Jr., W. W. BURCHETT and JOSEPH D. HARKINS for appellants.

JOE HOBSON and E. P. HILL for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

On the 1st day of July, 1934, Ballard Hunter was elected by the county board of education of Floyd county as superintendent of schools of that county for a term of four years.

Henry Porter, on January 6, 1936, lodged with the board of education written notice setting out charges for removal of Hunter, who was given fifteen days in which to respond before the action of the board was taken on his removal. He complains because the written charges were not spread on the minutes of the board. It was not incumbent upon Porter to spread them on the minutes of the board.

Section 4399-38, Ky. Stats., Supp. 1934, allows the board to appoint a person other than member of the board or to permit the superintendent to act as the secretary of the board. This section expressly provides that "the secretary shall keep the records of the board and perform such other duties as may be imposed upon him by such board," including the duty of signing its orders. The secretary is the custodian of all documents and other papers of the board under such conditions as the board may direct, which records shall be available to the superintendent at any time.

It appears that the board had selected a secretary other than the superintendent and it should be plain that any dereliction of the secretary respecting the spreading on the minutes of the board the written charges filed by Porter is unavailing to the superintendent to deprive the board of performing its duty to hear, and determine, in the manner provided by law, Porter's charges for his removal, since the secretary respecting the spreading them on the minutes of the board was, at the time, under the supervision of the superintendent as executive agent of the board.

Porter's written charges were in thirty-three separate paragraphs which may be, in part, summarized thus: He had failed, refused, and neglected to discharge the duties enumerated specifically in the charges, within the purview of section 4399-34; that acting in concert with the board of education, he had delayed for political purposes the selection and employment of teachers until in the fall of 1935. He was charged with extorting from the teachers promises of support of his choice of candidates for members of the county board of education; and had nominated teachers in consideration of their support at the regular election of members of the board of education; had permitted teachers to discontinue their duties as teachers and employed substitutes for them for the purpose of enabling them to work for the election of his choice of candidates for members of the board of education; he had caused and permitted assessments of teachers to be made for the purpose of bringing about the election of his choice of candidates for members of the board of education; he had employed Elymas Anderson as teacher when she was not the holder of a certificate to teach; permitted numerous teachers to take their time from teaching, to promote his choice of the candidates for members of the board of education; permitted the clerk of the board to desert the work of his office and espouse the cause of his choice of candidates for members of the board of education.

Porter preferred other charges against him, but it is our view that it is entirely unnecessary to state them.

To intelligently, fairly, and properly consider the foregoing causes for Hunter's removal, it is essential to review them in the light of the Constitution and the Statutes made in pursuance thereof, and the facts adduced to substantiate them.

Section 183 reads:

"The general assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the state."

Pursuant to this constitutional provision, the Legislature has created and provided for the election by secret ballot of a board of education of each county of

the commonwealth, comprised of five members (section 4399-17, Ky. Stats., Supp. 1934) possessing the qualifications stated in section 4399-22.

The powers and duties of each board of education are enumerated in section 4399-20 et seq., Ky. Stats., Supp. 1934. One of these duties is the appointment of a superintendent of schools with power of removal by a vote of four members for cause; "provided that written notice setting out the charges for removal" are spread on the minutes of the board, and the superintendent given fifteen days written notice before action is taken on his removal. Section 4399-34 defines the things the superintendent shall do substantially thus:

"1. He devotes himself exclusively to the duties of his office.

"2. He advises his board:

"a. On all professional matters.

"b. As to state laws and regulations of the state board of education governing the administration of schools.

"c. As to the organization for efficient school service.

"d. As to the schools to be built, abandoned, or maintained.

"e. As to the number of teachers to be employed in each school, their qualifications, service records, sections, assignment, transfer, promotion and tenure.

"f. As to the organization of instruction and supervision.

"g. As to condition of instruction and discipline in the schools, needed supplies and equipment, and other phases of the school service.

"h. As to procedure and progress in school administration in other districts.

"3. He keeps complete data on the district's financial affairs.

"4. He reports the status of the treasury at each regular meeting, giving the balance, moneys due and moneys owing.

"5. He consults and works with the board in preparing the district's budget. He submits facts to support each item in it, seeing that every source of expected income is listed at no more than it can be reasonably expected to produce, that any assured balance is included, that every class of anticipated outgo is listed at no less than it can be expected to amount to, that all outstanding obligations are included, that a·reasonably safe reserve is provided for possible unforeseen contingencies, and that this budget is submitted in proper form for approval well in advance of the beginning of a new school year. (The better the administrative set-up the fewer will be the unforeseen contingencies.)

"6. He keeps data on the certification, qualification services and salaries of the teachers and other employees as well as upon the school population of his district.

"7. He reports a salary schedule (not a mere salary list) for approval at the earliest possible date, with facts to support each item. A good salary schedule will:

"a. Conform to the income budgeted for salary purpose.

"b. Provide a basal salary on at least the level of unskilled labor wage;

"c. Afford such increment for training as to make it possible for teachers to train for their work and such increment for successful experience as to give stability of personnel to the service; and

"d. Include such increase of salary for superior services as would stimulate teachers to put forth their best efforts.

"8. In the salary schedule and the organization of the school service, he provides for only such teacher-positions as are necessary, approximating one teacher to every thirty to thirty-five children expected in average attendance for the term, whether of elementary or high school grades.

"9. He sees that this schedule is fair and just,

without discrimination between elementary and high school teachers and white and colored service.

"10. He submits to the board definite recommendations as to policies and procedures and plans for carrying all approved policies into effect.

"11. He keeps complete and accurate data on his own office and services.

"12. He reports to the board at its monthly meetings the services he has performed the preceding month, including his whereabouts and activities for each day of the month.

"13. At the close of the school term, he makes to the board a composite report of the district's school service for the term as rendered by its employees.

"14. At the close of the school year, on behalf of himself and the board, he makes such detailed reports to the state as are requested by the Superintendent of Public Instruction."

See Administering The County School System—Jaggers—pages 39, 40, 41.

The board is given power to select an attendance officer. The efficient system of common schools of each county of the commonwealth is intrusted by the Statutes to the board of education, the superintendent of county schools, the attendance officer, and the teachers of the common schools of the county.

Section 4434-15, Ky. Stats. Supp. 1934, imposes upon the teacher of any school the duty to "report to the superintendent of schools of the district in which the school is situated the names, ages, and places of residence of all pupils in attendance at their schools together with such other facts as said superintendent may require to facilitate the carrying out of the provisions of the laws relating to compulsory attendance and employment of children." And "whenever any child of compulsory age withdraws from school," the teacher shall ascertain the reason and immediately transmit to the superintendent the fact of the child's withdrawal and the reason therefor. Section 4434-16.

The attendance officer, by section 4434-12, is giv-

en the power "to investigate in his district [county] any case of non-attendance at school of any child under sixteen years of age, or any child suspected of being under sixteen years of age, and he may take such action * * * as the superintendent of schools may direct or as he himself may deem proper in the absense of specific directions."

Section 4434-13 confers upon the attendance officer police power as therein stated.

Any child absent from school without excuse for more than three days or tardy for more than three days (and the absence for less than half a school day is regarded as tardy) is deemed truancy. Section 4434-14.

Sections 4434-22, 4434-23 impose a penalty upon any principal or teacher or attendance officer who willfully fails to comply with the foregoing provision.

It will be observed that the statutes theoretically provide an efficient system of common schools for each county, and exact and demand of the county superintendent as the executive officer of the board of education a fair and impartial, a loyal and faithful performance of his duties, in his administration thereof, strictly in accordance with the Statutes.

The school system thus set up and intrusted to him is not a trade which he, or the board of education, has a right to set up and exercise for his or its own aggrandizement, but it is altogether a trust. The county superintendent has no rights that are not altogether duties. The common school system of the county is supported by mass taxation, for the sole use and benefit of the children of the county eligible to enter and attend the common schools.

The extraordinary power vested by the Statutes in the superintendent, with the sum allotted to each county for school purposes, often becomes a local center, around which every kind of petty corruption generates and forms, to the detriment of the pupils of the schools. When once such a vicious system is established in a county, it becomes the guard and protection of inferior abuses. The superintendent, who is the recipient of the emoluments of such system, is the

last person to promote a spirit of reform, lest in the event it should reach himself. Where this condition exists, it is always his interest to conceal, or, if need be, to defend inferior abuses, as a part of the outworks to protect the citadel; and in species of such fortification, all the parts have such a common dependence that it is seldom, if ever, to be expected that the participants or beneficiaries will attack each other. It is the master fraud which shelters all others. It is a matter of general knowledge that the superintendent who desires to secure a board of education willing to participate in the spoils of his office will subordinate the interest, the success, and welfare of the schools of the county to re-elect a board of trustees, able, willing, and ready to perpetuate him in office.

It is patent that the superintendent to conform to his statutory duties, must "devote himself exclusively to the duties of his office." To do this efficiently and in the manner intended by the Statutes, it is necessary that he budget his time, carefully plan and follow a well-defined, yearly calendar program. State of Oklahoma, Department of Education, Bulletin 134, page 44. When executing such program, there is not time or opportunity for him to intermeddle with the election of the members of the board, farther than to see that qualified and fit persons are selected as candidates and placed on the ballot for the voters uninfluenced by the power of his office to exercise the privilege of choosing them; nor to intimidate or coerce the teachers under his supervision in order to have them co-operate with him in the election of his choice of candidates for membership of the board, or engage in panhandling the voters, either before or on the day of the election, either with or without the aid of his friends, to select a board to continue him in office.

The evidence is too voluminous to be reproduced. It is sufficient to say that we are convinced that it clearly, positively, and adequately establishes t h a t Hunter in some instances at least, when employing teachers, did so with the intent to influence and con trol the election of his choice of candidates for members of the county board of education; failed to visit a number of the schools of the county [see Meade County Board of Education v. Powell, 254 Ky. 352,

71 S. W. (2d) 638, 640], gave no attention to the teachers' reports to ascertain whether they showed or did not show truancy, and utterly disregarded his, the teachers', and attendance officer's duties to enforce reasonably the cumpulsory school law. Indeed, his time, energies, and supreme efforts, during the school year of 1935-36, with the added power of his office, were employed in an endeavor to elect a board of education to perpetuate his regime. To accomplish this, he postponed the closing of contracts with teachers until near to the date of the election, plainly, to enable him to intimidate and coerce them and their friends to support and elect his choice of the candidates for members of the board. And after the election he engaged a portion of his time not in visiting schools for their betterment, but to ascertain and locate evidence to be used in a contest favorable to his candidates for membership of the board.

To dispose of properly and fairly the issues necessary to a just decision in the case, we do not deem it incumbent upon us to consider the other charges preferred against Hunter or his defenses thereto.

Whether the board's removal of him "was politic or unpolitic, commendable or uncommendable, wise or otherwise," we are limited to this:

"Did the board act arbitrarily? Did it act corruptly? Did it act without credible, competent, and relevant evidence? Did it transcend its authority? Did it act capriciously? Did it abuse its discretion? In other words: Did it act unlawfully?

The answer to these questions is: 'No.' "

Meade County Board of Education v. Powell, 254 Ky. 352, 71 S. W. (2d) 638, 640; Howard v. Bell County Board of Education, 247 Ky. 586, 57 S. W. (2d) 466; Board of Education of Boyle County v. McChesney, 235 Ky. 692, 32 S. W. (2d) 26; Graham v. Jewell, 204 Ky. 260, 263 S. W. 693; Smith v. Board of Education of Ludlow, 264 Ky. 150, 94 S. W. (2d) 321.

We are not authorized to substitute our judgment of the weight and verity of the evidence for that of the board.

Hunter complains that he was not afforded by the

board ample or sufficient time in which to present his evidence. We find no merit in this contention. The mere statement that the hearing before the board began January 25, 1936, and continued to February 8, 1936, is an ample answer to this insistence, in the absence of some affirmative showing to the contrary. He claims that the proceeding before the board was actuated by bad motives. Whatever may have been the motive for its institution is immaterial. The real question is whether there was legal cause for his removal, and for that purpose the proceeding was instituted. That being granted, it does not lie in his mouth to question the motive which actuated its institution. Diuguid v. Roberts (Ky.) 121 S. W. 464; Dickerman v. Northern Trust Co., 176 U. S. 181, 20 S. Ct. 311, 44 L. Ed. 423; Gayle v. Greasy Creek Coal & Land Co., 249 Ky. 251, 60 S. W. (2d) 599.

His contention that the trial court prematurely submitted the cause for trial and judgment and rushed him into trial does not favorably impress us as grounds for reversal. He argues that the grounds of removal, as stated in Porter's written notice, are too vague and indefinite, and are, "in effect no charge at all." It should be admitted that this contention is not meritorious. He argues that the election of members of the county board of education "is not partisan politics, but non-partisan; and that the statute requiring Hunter to devote himself exclusively to the duties of his office, can in no sense be given, the narrow meaning that a superintendent could not make a speech in the course of a political campaign, when he being lambasted, his administration criticized, and he dared to make a response to such criticism."

Considering the views we have expressed, it is entirely unnecessary to discuss this phase of the case, or any of the other charges preferred against him.

Lastly, he argues that two members of the board who participated in the trial were disqualified. It is sufficient to say the evidence fails to establish their disqualification to act in the trial of the proceeding against him with their associate members of the board.

In the Powell Case we said:

"Courts cannot inquire into the motives of the

board, and cannot say the testimony of one witness should be believed rather than that of another, * * * there is but one question left, and that is: Did the board have before it any competent and relevant evidence? The answer is, 'Yes,' and that is the end of it.''

Wherefore, the judgment is affirmed.

The Whole Court sitting.