(No. 26552.—

CHILDREN'S HOME OF ROCKFORD *et al.*, Appellants, *vs.* JOHN ANDRESS *et al.*, Appellees.

*Opinion filed September 21, 1942—Rehearing denied Nov. 10, 1942.*

FLOYD E. THOMPSON, KARL C. WILLIAMS, LISLE W. MENZIMER, and EDGAR R. ROMBAUER, for appellants.

FRANK E. MAYNARD, for appellees.

Mr. JUSTICE MURPHY delivered the opinion of the court:

This cause comes to this court from the Appellate Court on an order granting leave to appeal. The appeal to the Appellate Court was from a decree entered in the circuit court of Winnebago county. On and prior to October 1, 1934, Lena M. Barnes owned 525 shares of the capital stock of the Barnes Drill Company, an Illinois corporation. On that date she transferred to John Andress, Albert M. Johnson and Walter M. Fairbairn 95 shares each. On the

27th day of November, 1935, she transferred the remaining 240 shares to the same parties by separate certificates, 80 shares each. Mrs. Barnes died January 8, 1938. Her will, dated November 9, 1937, devised and bequeathed all her property to her brother Charles Fred Sully. Andress and Johnson were named executors and upon probate of the will letters testatmentary were issued to them. The Children's Home of Rockford, whose interest will be hereinafter shown, instituted this suit against Andress, Johnson and Fairbairn individually, and the executors of said estate, for the purpose of canceling the two sales of stock and having it returned to the estate of Lena M. Barnes, or its value accounted for. Later Charles Fred Sully was granted permission to join as a party plaintiff. After a hearing of evidence before the chancellor, a decree was entered which sustained the transfer of October 1, 1934, and set aside the one of November 27, 1935. Defendants, Andress, Johnson and Fairbairn, appealed from that part of the decree which canceled the second transfer. The Children's Home of Rockford filed a cross-appeal from that part of the decree which pertained to the first transfer. The Appellate Court affirmed the decree as to the first and reversed it as to the second. The Children's Home of Rockford and Sully, who were plaintiffs in the trial court, are appellants here and will be referred to as plaintiffs. Andress, Johnson and Fairbairn will be referred to as defendants.

Plaintiffs' attack on both transfers of stock is based on the charge that Mrs. Barnes did not at the time of the transfers have sufficient mental capacity to transact ordinary business, and that at the time of the transfers a fiduciary relationship existed between the defendants and Mrs. Barnes. The defendants denied each of these charges.

Prior to 1907, B. Frank Barnes assisted in organizing a corporation to which the Barnes Drill Company is a successor. The original corporation was reorganized and the corporate name changed in 1907. Barnes owned the

major part of the stock at that time. Defendant Andress entered the service of the corporation about that time, acquired stock and has been active in its management. Johnson and Fairbairn became interested both as employees and stockholders and have been connected with the corporation in both capacities for a number of years. The present company was capitalized at $100,000, represented by 1,000 shares with a par value of $100 each. B. Frank Barnes remained in active control of the business until his death in 1919. Thereafter the management of the affairs of the corporation rested on the defendants. Upon the death of Barnes, 525 shares of the stock owned by him passed to his widow, Lena M. Barnes. She continued as owner until the making of the transfers involved in this litigation. At the time of the first transfer, Mrs. Barnes owned 525 shares, Andress 120, Johnson 80 and Fairbairn 25. The ownership of the remaining shares is not shown.

Mrs. Barnes executed several wills, but only two need be mentioned, the one dated November 9, 1937, which was admitted to probate, and one dated June 29, 1934. The Children's Home of Rockford, plaintiff, and Rockford Hospital shared equally as residuary beneficiaries under the will of 1934. The probate of the 1937 will was resisted by the Children's Home and after the will was admitted to probate the home threatened to contest it on the grounds of mental incapacity of testatrix. A settlement contract was entered into whereby the 1937 will would stand as the last will and testament of Lena M. Barnes and that in lieu of the whole estate going to Charles Fred Sully, he should receive a one-half and the Children's Home of Rockford and the Rockford Hospital should each receive a one-fourth part. It is by virtue of the interest that the Children's Home of Rockford acquired under this contract that it claims an interest in the estate and the right to maintain this action. The hospital was made a party defendant but was defaulted.

In 1934, Lena M. Barnes was 73 years of age. Prior to that time, her physical and mental condition are conceded to have been normal. She had no lineal descendants and lived alone except for a maid employed by her. For several years prior to 1927 she was president of the Barnes Drill Company and was a member of the board of directors until 1936. She attended most of the directors' meetings but there is no evidence that she was in any way active in the management of the affairs of the corporation. In 1927, Andress succeeded her as president and continued in that position until 1938. Johnson and Fairbairn held positions of responsibility and trust with the company for a number of years.

Mrs. Barnes' property consisted principally of stocks, bonds and mortgages. Immediately after the death of her husband, Andress began assisting her in private business affairs. On the 13th of May, 1935, Mrs. Barnes executed a power of attorney appointing R. K. Welsh, a lawyer, as her attorney in fact. As such he assumed full control of her property, opened a special account in the bank in his name as agent and rented a safety-deposit box for the safekeeping of her securities. It does not appear that anyone other than Andress advised Mrs. Barnes in reference to her business matters prior to the appointment of the attorney in fact. After that Andress continued his services to her and her estate but it was in a minor role and subject always to the sanction of her agent, as will be hereinafter pointed out.

Plaintiffs claim the mental incapacity became evident in 1934 and continued to the date of her death. The incidents pointed out in support of this change are are follows: In May, 1934, Mrs. Barnes purchased an automobile and in negotiating for it and in receiving instructions as to its operation she became acquainted with La Verne Bengston, who was about 33 years of age. His frequent visits to her home and her attitude toward him soon caused concern

among her former acquaintances and many of them ceased to visit .her. She gave Bengston money in 1934 and in February or March of 1935 she sold various stocks and gave him $3200 out of the proceeds. Early in May, 1935, Bengston inquired at the office of a brokerage firm in Rockford relative to the sale of some General Motors stock. They required the application for their employment as brokers to be signed by the owner of the stock. Mrs. Barnes went to their offices and signed such application and they sold a block of stock for her. She received their check for $9010.76. She presented the check to the bank for payment the same day she received it. The banker, who evidently had known something of her gifts to Bengston, formulated an excuse to avoid immediate payment of the check. In the meantime, he contacted Andress and told him of Mrs. Barnes' possession of the check. The part Andress took to prevent Mrs. Barnes from giving the proceeds of the check to Bengston and to safeguard her other securities is not shown, but that he did something may be readily inferred from what followed and from the fact that he testified that when he received the information from the banker he said: "I got to thinking what could be done to save that check." Two days following the presentation of the check, Mrs. Barnes and the three defendants, accompanied by Mr. and Mrs. Essley, acquaintances of Mrs. Barnes for many years, met at the law office of R. K. Welsh. The only evidence as to what occurred at this meeting is the testimony of Judge Welsh and the Essleys. They testified that it was proposed by some one and sanctioned by Mrs. Barnes, that Welsh accept an appointment as her attorney in fact to have full charge of her property. Welsh advised them he did not care to undertake it if it incurred the duty of auditing and paying her current living-expense accounts. Arrangements were made whereby such claims would be presented at the office of the Barnes Drill Company and paid by the company,

as they had previous to that time. The power of attorney gave R. K. Welsh full power to take possession and control of all securities and to handle, manage, collect and reinvest the proceeds received therefrom, to keep a complete and detailed record and account of such receipts and investments, to pay and discharge all accounts and items of indebtedness of Mrs. Barnes from time to time and to pay over to her from time to time such funds as she might require. He was authorized to have access to the safety-deposit box in the Illinois National Bank & Trust Company. Except as required for collection and management, all securities were to be kept in a safety-deposit box.

A special bank account was opened in the name of the attorney in fact and Mrs. Barnes' securities were taken from the safety-deposit box where formerly kept and delivered to the agent and he procured another box in his name as agent. She also delivered the $9000 check and the agent deposited it in the special account. The business connected with her private estate was continued under this arrangement until her death. Sometime after the execution of the power of attorney, Mrs. Barnes' brother, Charles Fred Sully, began to make his home with her and from that time Bengston's visits became less frequent and her interest in him ceased. Plaintiffs' claim the appointment of an agent with power of attorney was, under the circumstances, tantamount to the appointment of a conservator. Such suggestions imply mental incapacity but the evidence does not support such an inference. It appears Mrs. Barnes' fascination for Bengston and her determination to bestow gifts upon him were so foreign to her conduct in prior years that her friends became gravely concerned about her welfare and the preservation of her property. That such concern was fully warranted is clearly established by the evidence. It was these circumstances that opened the way to the appointment of the attorney in fact. While the facts

surrounding the execution of the power of attorney and the purpose which led to its execution are proper to consider on the issues presented, yet we do not find there is anything in them which would warrant attaching the same weight to the execution of the power that would be given the appointment of a conservator in a court proceeding.

From 1934 to the time of her death, Mrs. Barnes suffered from fainting spells in which she would fall unconscious and remain so for a period of minutes. The weight of the evidence is that for a few hours following such attacks her mental condition was clouded, but after a time she would become normal and remain so for weeks or in some instances for months. She had arterio-sclerosis and the ailments that usually accompany such condition. She was able to go about her home and made frequent trips to the city in the purchase of household supplies until near the time of her death, but from early in 1934 her physical condition gradually became weaker and her activities more restricted.

In addition, plaintiffs call attention to the testimony of certain witnesses called by them. Among others they introduced the testimony of five witnesses who had been drivers of motor busses operating bus lines on the street near Mrs. Barnes' home. They all testified to frequent occasions in 1934 and 1935 when Mrs. Barnes was a passenger on the bus. Various incidents are related as to what she said, her actions and the subject of her conversations. One of them testified to her refusal to leave the bus at the regular stop sign near her home and others told of her failure to recognize her home and her disconnected and meaningless conversations. There was evidence that times she would forget to pay her fare until demand was made and at times she would talk to the driver about things in which they would not be expected to have any interest. Two of them expressed the opinion that she was not mentally competent

to transact ordinary business. The other three were not asked as to such matters but they expressed the opinion that her mental condition was bad, and steadily grew worse.

Clarence Steward was called as a witness by the plaintiffs. He was a regular employee of the Barnes Drill Company but at frequent intervals in 1934 and 1935 was sent to the home of Mrs. Barnes to work about the house and yard. He received his pay from the company but it was charged to Mrs. Barnes' account. He testified to her lapses of memory and of seeing her in a fainting spell. He described her physical condition as being weak and frail and it was difficult for her to get in and out of the automobile. He drove her car on trips about the city and told of her failure to remember the location of houses of friends whom she had known for years. He testified to Bengston's frequent visits to her home. His opinion was that she was not mentally capable of transacting ordinary business.

Stella Martinson, a niece of Mrs. Barnes, saw her every three or four weeks during the years of 1934 and 1935. She testified that she noticed a change in her mental and physical condition in 1934 and in November of that year saw her immediately after she had a fainting spell in which she fell and injured an eye and one side of her face, which remained discolored for weeks. She told of incidents in which Mrs. Barnes would repeat the same statement at intervals of a few minutes, that her sentences were disconnected and meaningless and at Christmas time in 1935 she saw her when she had delusions and believed that a voice on the radio was that of Bengston. She told of instances of her forgetting names and the locations of homes and acquaintances she had known for years and of her unseemly action toward Bengston in public places. It was her opinion she was not mentally capable of transacting ordinary business.

John B. Freeman, an acquaintance of Mrs. Barnes for many years, testified he saw her occasionally during the

years of 1934 and 1935. The first change he noticed in her mental condition was in 1935 and it was brought to his attention by her forgetfulness and failure to remember scenes and places which she had known for years. Mrs. Freeman testified to some of the same events included in the testimony of her husband and added others with greater detail, all pertaining to matters of the same character. Her opinion was that her mental condition was greatly impaired.

Plaintiffs introduced testimony of other witnesses in rebuttal in which they expressed opinions adverse to the stability of Mrs. Barnes' mental condition. Objection was made to this evidence on the grounds that it was not proper rebuttal. The objections should have been sustained but the rule in a case of this character is that it will be assumed that the chancellor considered only the competent evidence.

It will not be necessary to extend this opinion by a detailed analysis of defendants' evidence on mental capacity for the reason it is of such a character as to make it more convincing than plaintiffs' evidence on the same question. It shows that in 1934 and 1935 Mrs. Barnes employed a contractor on different occasions to make repairs to her home, she purchased some of her household necessities, sold securities, attended meetings of the board of directors of the drill company and on at least one occasion made a motion for some routine matter before the board. No question is raised but what in the sale of her securities, the purchase of her automobile, household supplies and other matters she exercised a degree of mentality sufficient to make such transactions. Plaintiffs' evidence is barren of any attempted business transactions. In a case involving this question, evidence of business transactions having been consummated during the time in question is most convincing as to mental ability. In June, 1934, she executed the will in which the Children's Home was a beneficiary and it is upon the possibility that such will could have been duly proven and probated that the Children's Home pro-

cured the settlement contract under which it now claims a part of the estate. Although the law distinguishes between the mentality required to make a will and that required to negotiate a sale, the making of the will under the circumstances shown has some bearing on this question which is counter to plaintiffs' contentions.

The evidence showing the conditions under which the two transfers of stock were made also reflects upon her mental condition. In 1916, Mr. B. Frank Barnes and his wife, Lena M. Barnes, were in the law office of R. K. Welsh for the purpose of having a will drawn for Mr. Barnes. A conversation that occurred between the two as related in the evidence of Judge Welsh shows that Mr. Barnes, in appreciation of the faithful and valuable services the defendants had rendered the Barnes Drill Company, wished to dispose of his stock in such a way as to favor them. Judge Welsh testified that Mr. Barnes asked questions as to the effect of the widow's renunciation of the will and about giving some personal property to Andress, Johnson and Fairbairn and that he explained to Mr. Barnes that his purpose could be accomplished by creating a trust and giving any personal property to the trustee for the benefit of the beneficiaries and that Lena M. Barnes said "there is no need of your doing that; if you want some of the property which you now have, the Barnes Drill Company stock to go to these three boys, Andress, Johnson and Fairbairn, if you give this property to me, I'll agree with you that I'll carry that out," and Mr. Barnes, feeling assured his purpose would be fulfilled by that promise, the will was drawn bequeathing all of the property to Lena M. Barnes, without any limitation upon her ownership or right to transfer. Although it can not be given the effect of a testamentary direction, this evidence may well be considered as showing the purposes Mrs. Barnes had in making the transfers of stock to the defendants.

The first day of October, ·1934, in conversation with Mr. and Mrs. E. L. Essley, acquaintances for over thirty years, Mrs. Barnes expressed the wish to sell some of her stock in the company and recalled the promise she had made her husband at the time of the making of his will. The morning following such conversation, Mr. Essley contacted defendants about the purchase of a part of the stock and that afternoon Mrs. Barnes, the Essleys and the defendants met at the law office of Judge Welsh. It was agreed she was to sell 285 shares, 95 to each defendant at the par value of $100 per share. Inasmuch as Mrs. Barnes was parting with enough stock that she would no longer have control of the corporation, an escrow agreement was drawn which provided the stock, which the defendants formerly owned, should be placed in escrow to secure the faithful performance of their agreement that they would not dispose of their previous holdings and would continue in the service of the corporation. The stock purchased from Mrs. Barnes was· pledged by defendants as security to the unpaid balance of the purchase price. Defendants paid the balance in full in March, 1935.

The circumstances surrounding the transfer of the stock on November 27, 1935, appear only in the testimony of Judge Welsh, who drafted the papers in connection with such transfer. ⸴ He testified that Mrs. Barnes expressed her wish to give defendants the remaining 240 shares, that she recalled the promise she had made her husband when his will was drawn. Judge Welsh says he told her "I do not believe you ought to do that without getting something by way of income at least on the stock. This arrangement with your husband was to turn it over when you were through with it and there is still some securities in your estate that we are not getting much of any income on yet and some that are bad." He says, "I think you better have another talk with these boys and see just what arrangements

you can make about that if you want to do that." He fixed the date of this conversation as early in November, 1935, and said that on November 27, defendants and Mrs. Barnes returned to his office, that some one of them told him in the presence of Mrs. Barnes that the 240 shares of stock were to be turned over to them, 80 shares to each, and that they would give an obligation to Mrs. Barnes to pay interest on the par value of the stock and an annual payment on the principal of 10 per cent of such value until it was all paid, provided that any payments that had not matured when Mrs. Barnes died should be canceled and discharged. He says she stated that such was the agreement. The transfers were made and new certificates issued. Each of the defendants gave Mrs. Barnes an obligation to pay $8000 with interest payable semi-annually and to pay annually 10 per cent of the par value of the stock, subject, however, that upon her death any amount which had not matured at that time was to be canceled. The last interest payment was made on November 29, 1937, and each defendant had made two annual payments on the principal, totaling $1600.

Plaintiffs failed to prove their general allegation that Mrs. Barnes was, during the years 1934 and 1935, mentally incompetent to transact business. If their case rested solely on the claim that they had made such proof, it would be adjudged against them. However, they make the further contention that a fiduciary relationship existed between the defendants and Mrs. Barnes. If such relationship existed at the time of these transfers, then the transactions are deemed to be presumptively fraudulent and will be set aside, unless the defendants in whom the confidence and trust was reposed establish their fairness by clear and convincing proof. *Seely v. Rowe,* 370 Ill. 336; *Mors v. Peterson,* 261 id. 532.

The parties differ as to whether a fiduciary relationship was established. There are several rules couched in gen-

eral terms which have been adopted to serve as a guide in the determination of such question. It is settled law that courts of equity will not set any bounds to the facts and circumstances out of which a fiduciary relationship may spring. It includes not only all legal relations such as guardian and ward, attorney and client, principal and agent and the like, but it extends to every possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side and resulting domination and influence on the other. (*Beach* v. *Wilton*, 244 Ill. 413; *Kosakowski* v. *Bagdon*, 369 id. 252.) The relationship need not be legal but it may be either moral, social, domestic or merely personal. (*Seely* v. *Rowe, supra; Mors* v. *Peterson, supra; Roby* v. *Colehour*, 135 Ill. 300.) To establish a fiduciary relationship by parol evidence the proof must be clear, convincing and so strong, unequivocal and unmistakable as to lead to but one conclusion. (*Johnson* v. *Lane*, 369 Ill. 135; *Neagle* v. *McMullen*, 334 id. 168.) Such relationship being established the burden is on one benefitting by the transfer of property to show that it was procured fairly and without the exercise of undue influence.

For several years prior to the execution of the power of attorney, in May, 1935, Mrs. Barnes rented a safety-deposit box for the safe-keeping of her securities and Andress was given access to the box. In a few instances, checks which were made payable to her order, in care of Andress, were endorsed by him in her name and the money deposited to her credit. He purchased and sold securities for her, appeared in her behalf in adjusting matters with delinquent debtors whose notes she held, and bills which were presented to the office of the Barns Drill Company were approved by him, paid and charged to her account with the company. Defendants contend that Andress performed this trust with the greatest of fidelity, always reporting to her and accounting for all money received; that he never opened the safety-deposit box except in her pres-

ence and bought and sold securities only when authorized by her. There is no doubt as to his fidelity to the trust she reposed in him, but to establish a fiduciary relation it is not necessary to prove actual frauds. *Kosakowski* v. *Bagdon, supra; Mors* v. *Peterson, supra.*

With the execution of the power of attorney in May, 1935, the control and management of the property was given to Welsh, but there is evidence that after that date Andress continued to advise in reference to it and to be solicitous in regard to Mrs. Barnes' welfare. In July, 1936, he wrote a letter to a paint and paper firm, telling them that attorney Welsh had approved their offer for work on Mrs. Barnes' house and Andress gave them directions as to how the work should be done and where their bill should be presented for payment. In another letter, without date, addressed to attorney Welsh, he stated that the problem of handling Mrs. Barnes "is becoming complex" and recommended that her maid be given an advance in wages. In December, 1936, another letter to Judge Welsh in regard to Mrs. Barnes said: "I, too, find it difficult to handle this affair satisfactorily but we have got to be careful so it does not pass into other hands of her selection and present a situation where considerable sums of money might be dissipated." Mrs. Martinson and Mr. Freeman both testified to conversation with Andress in which he said Mrs. Barnes was angry at him, presumably from his opposition to her gifts to Bengston, but it does not appear that such feeling constituted a break so as to end the confidential relationship. The banker communicated the information to Andress that Mrs. Barnes had the check for about $9000. Andress' reaction was to do something to prevent that money from going to Bengston. The record does not disclose the details but it does tell that he and the other two defendants went to Judge Welsh with her, and an attorney in fact was appointed, which put the making of gifts of large amounts to Bengston beyond her power. Such action is not stated in the sense of condemnation but for the pur-

pose of emphasizing the influence of Andress and others in having Mrs. Barnes cast aside her determinations to give to Bengston, and place her property in the hands of a competent agent who would save it for her. Such circumstances indicate the confidence she reposed in Andress and those who were endeavoring to help her. From all the facts shown, we conclude that the fiduciary relationship which existed prior to the execution of the power of attorney continued at least into the year 1936 and that both transfers of stock occurred during its existence. The sales of stock to the defendants were each considered as one transaction and, under the circumstances shown, the fiduciary relationship that existed between Andress and Mrs. Barnes must, as far as these transactions are concerned, be held to include Johnson and Fairbairn.

In determining whether the evidence shows these transactions were carried on by defendants with that degree of fairness required in matters where a fiduciary relationship exists, it is necessary to examine the evidence in reference to the value of the stock. The stock was not listed on any stock exchange and no sales appear to have been made near the time of the transfer. The chancellor found the value to be $200 per share. Plaintiff offered testimony of an accountant who had examined the books of the corporation and from such information he testified the book value per share at the time of the first sale was approximately $430 and at the time of the second sale about $10 per share less. Robert Gaylord, engaged in the manufacture of machine tools and president of a company engaged in such business, testified he was acquainted with the character of products the Barnes Drill Company manufactured and the nature of its business, that he had examined the audit sheet made by the accountant and, from his knowledge of the business and audit sheet, he was of the opinion the book value was approximately $380 per share.

Defendants offered the evidence of James J. O'Connor, an experienced stock broker and trader in unlisted stocks,

and who had acquaintance with the personnel and management of the Barnes Drill Company. He fixed the fair value at $90 to $115 per share. Three other witnesses possessing similar qualifications fixed the fair value at $70, $80 and $100 per share, respectively. Mr. E. L. Essley, who had known the business of the drill company from its incorporation and for thirty years been engaged in selling its manufactured product, testified that in his opinion the stock was worth not to exceed $100 per share. There is nothing in the record to indicate any substantial difference in value of the stock on the dates that the two sales were made. Plaintiffs' method of proving value of stock by showing book value is questioned by defendants but without deciding, by giving sanction or disapproval to such method, it is clear the chancellor's finding of value is not supported by the evidence. The weight of the evidence indicates a fair value to be $100 per share. On this appeal plaintiffs virtually concede the part of the decree which pertains to the sale of October 2, 1934, will have to be affirmed. The purchase price was a fair value and the terms of the escrow contract and the collateral security agreement fully protected Mrs. Barnes' interests. Contracts were fully executed and she received the balance of the purchase price in full in March, 1935. Even though the fiduciary relationship existed at the time of the sale, the evidence shows that the sale was made on such terms it should not be set aside. The judgment of the Appellate Court affirming the part of the decree of the circuit court which pertains to the sale of October 2, 1934, is affirmed.

The transfer of the stock on November 27, 1935, was upon a different basis. It possessed the elements of a sale with a conditional gift attached. No part of the purchase price was paid at the time the stock was transferred and the first installment of $800 did not mature until November 27, 1936. A like amount was to mature each anniversary date thereafter until the full sum of $8000 was paid but the contract contained a condition, that if Mrs.

Barnes should die before any or all of the installments had matured, those that were unmatured should be canceled. The only explanation defendants offer for the insertion of such condition is the promise which Judge Welsh testified Mrs. Barnes gave her husband when he executed his will. There is uncertainty as to the substance of that promise. Judge Welsh's statement indicates that B. Frank Barnes wished to do something with some of his property for benefit of defendants, but it will be observed that he did not testify that Mr. Barnes wished to make disposition of the stock in the Barnes Drill Company to defendants, for his reference is to property generally. Reference to stock in the drill company is found in Mrs. Barnes' reply and not in her husband's statement. There is no explanation as to why the first transfer should be by the medium of a sale upon definite terms for a fixed consideration, and the consideration of the second sale be payable only upon condition that Mrs. Barnes survive the maturity of the installments. Two installments matured during the lifetime of Mrs. Barnes, totaling $20 per share, both of which were paid, but the condition inserted in the paragraph resulted in a direct benefit to defendants, the fairness of which they have not established. The judgment of the Appellate Court reversing the decree of the circuit court as to the second sale was erroneous.

Defendants contend the Children's Home of Rockford had no right to maintain this action. Since Charles Fred Sully, the sole beneficiary under Mrs. Barnes' will appeared as a party-plaintiff and had an unquestionable right to maintain the action, it will be unnecessary to pass on the right of the Children's Home of Rockford to appear as plaintiff under its contract of settlement with Sully.

The decree of the circuit court ordered defendants to return 240 shares of stock to the estate of Lena M. Barnes and to pay all dividends received by them subsequent to November 27, 1935, and that such dividends draw interest at the rate of 5 per cent per annum, each of the defendants,

however, to receive a credit for the $1600 paid on the stock with due allowance for interest on the same. If the dividends and interest thereon did not equal the credit, the executors of the estate were to reimburse the defendants from the estate funds. The defendants were enjoined from transferring or disposing of 240 shares of stock. Under the views expressed the decree of the trial court is approved in every respect except as to the finding as to valuation, and that finding was only material in determining the main issues presented. Since the decree directed the retransfer of the stock to the estate and contained no provisions for an accounting of the value, the finding of the value does not affect the result reached.

For the reasons assigned, the judgment of the Appellate Court is affirmed as to that part of the judgment which affirms the decree as to the sale of October 2, 1934. In all other respects the judgment of the Appellate Court is reversed and the decree of the circuit court is affirmed.

*Judgment of Appellate Court affirmed in part, reversed in part; decree of circuit court affirmed.*