### KOTIMSKY v. LUBIN et al.
#### No. 493–D.

District Court, E. D. Illinois.
Oct. 18, 1945.

712

Leo Burk, of Danville, Ill., and Geist & Netter, of New York City, for plaintiff.

Allen K. Swann, of Evansville, Ind., Donovan McCarty, of Olney, Ill., George W. Hazlett, of Cleveland, Ohio, and Leigh M. Kagy and Harold Baker, both of East St. Louis, Ill., for defendants.

LINDLEY, District Judge.

Plaintiff Kotimsky began this suit in April, 1945, against the First National Petroleum Trust, Valley Oil Corporation, Sohio Petroleum Company, Herbert Lubin and various other individual defendants, seeking rescission of certain transactions and recovery of certain properties for the First National Petroleum Trust, hereinafter referred to as the Trust. Later he brought in other individual defendants. He sued as a shareholder, averring that it was futile to ask the Trust to bring suit. Later Clear Creek Corporation, by leave of court, intervened and joined as plaintiff. Kotimsky's interest in the Trust originated sometime in 1943; Clear Creek acquired its interest in November, 1942, in the form of 70,000 shares and $600,000 in certificates. These two dates may be of some importance in view of the fact that certain of the pertinent events occurred before Kotimsky received his shares but after Clear Creek acquired its securities.

Substantial averments of the complaint follow. The trust, a business trust under the laws of Rhode Island, was created August 1, 1940. It has outstanding 500,000 shares, income debentures in the amount of $2,150,000 and certain Trustee's certificates promising payment to their holders from proceeds of oil produced.

Approximately 300,000 shares were issued to nominees of defendant Herbert Lubin, who has at all times exercised dominion over and control of the Trust, the Trustee and the Trust Committee and who has initiated, negotiated and put into effect practically all transactions regarding oil properties for and on behalf of the Trust. The Trust acquired certain oil leases in various states and, later, 58% of all outstanding capital stock of Pryor and Lockhart, Inc., which owns and operates certain oil properties in the state of Kansas. The remaining 42% of the stock was owned by Messrs. Pryor and Lockhart.

On or about July 1, 1943, Mackenzie resigned as Trustee, and Pryor, one of the officers of Pryor and Lockhart, Inc., was designated his successor. Thereafter Pryor and Lockhart entered into a contract with Lubin, agreeing to sell the remaining 42% of the stock of Pryor and Lockhart, Inc., to Lubin or his nominee for $250,000, to be paid in securities of the Trust. About the same time, Pryor, as Trustee, procured a transfer to the Trust of the contract which Lubin had made with him and Lockhart for the purchase of their 42% of the stock of Pryor and Lockhart, Inc., and of certain oil leases belonging to Lubin, in consideration of which the Trust issued to Lubin $440,000 in notes, known as the Kansas notes. The leases transferred by Lubin were of comparatively small value and the substantial portion of the $440,000 was in fact, consideration for the assignment of the contract which Pryor and Lockhart had made to Lubin for the sale to Lubin of their 42% of the stock of Pryor and Lockhart, Inc. Pryor, as Trustee, and the Trust never completed the contract for the purchase of said 42% and never received any value for the notes issued for the assignment of the contract. The Trust issued and has outstanding certain other notes known as Illinois notes in an amount unknown to plaintiff, the consideration for which is unknown.

In 1943 Lubin negotiated a transaction whereby the Trust acquired from one Yingling, an associate and friend of Lubin, certain oil leases in Illinois known as the Case-Pomeroy properties, including the Helm A. lease, on certain property in the county of Wabash, Illinois. The Trust paid for the Case-Pomeroy properties, subject to certain overriding royalties retained by Lubin, $1,250,000, secured by a Trust mortgage of its property to Sohio.

Thereafter the Trust was unable to meet its obligations as they matured or to pay the principal and interest on the Kansas and Illinois notes and failed to complete its contract to buy 42% of the Pryor and Lockhart, Inc., stock. It defaulted on the payment of interest on its debentures. Lubin transferred or caused to be transferred the Illinois and Kansas notes to persons including defendant Greenlaw and his clients, friends, relatives and those of Lubin, himself, and to others closely connected with the management of the Trust.

In August, 1944, Pryor, as Trustee, conveyed ⅞ths of the Case-Pomeroy properties to Valley Oil Corporation which immediately retransferred it to Lubin. The Trust was paid no cash by Valley or Lubin but received only the surrender of certain Kansas and Illinois notes aggregating $260,000. These transactions were inaugurated and carried out by Lubin. The Valley Oil Corporation was formed, owned, dominated and controlled by Lubin. After receiving the property, Lubin, in order to procure and surrender to the Trust, $260,-000, traded to the holders of such notes equivalent participations in a second mortgage which he placed on the property. Later Lubin transferred to the Trust all his interest in all Case-Pomeroy properties other than the Helm A. lease and the Trust thereupon released to him its formerly retained ⅛th of the Helm A. lease.

Lubin has caused to be placed upon the latter lease another mortgage of $650,000, $300,000 of which has gone to preferred creditors of the Trust, who were interested in and related to the Trust management. The Trust received no adequate consideration for the transfer of the Case-Pomeroy properties or the Helm A. lease; and the transfer was fraudulent and void as against the Trust, its creditors and shareholders, because of a conspiracy in which defendants participated.

It is provided in the Trust Indenture that the Trust Committee should not sell any property producing more than 40% of the total income of the trust without ratification by ⅔rds of the shareholders. The property conveyed to Lubin produced more than 40% of the total income and the transfer was not ratified or approved by the shareholders. Pryor was never validly a trustee.

In September, 1944, Pryor resigned as Trustee and defendant Greenlaw was purportedly designated as his successor. In December, following, Greenlaw purported to sell to Pryor, his predecessor as trustee, and Lockhart, the 58% of Pryor and Lockhart, Inc., owned by the Trust, for $250,000, which was used by Greenlaw for the purpose of making preferential payment of Illinois and Kansas notes held by Greenlaw, his clients, friends and relatives and by members of the Trust Committee and friends and associates of Lubin. All these transactions were unauthorized and should be set aside. A demand upon the Trust and Trustee to institute action for rescission would be futile for the reason that the members of the Trust Committee acquiesced in the alleged fraudulent actions.

Plaintiffs pray that the transfers, mortgages and encumbrances of the Case-Pomeroy properties and of the Helm A. lease be declared fraudulent and void, set aside and cancelled of record; that the Case-Pomeroy properties and Helm A. lease be adjudged the property of the Trust; that the rights, title, liens and interests of the parties, and the rents, proceeds, increments and profits of the properties be determined and adjudicated; that a receiver be appointed and that plaintiffs and the Trust have such other and different relief as the court may deem equitable and proper.

Two answers were filed by the same solicitor, one in behalf of Lubin and the Valley Oil Corporation and the other for the Trust and the other individual defendants. These answers aver, amongst other things, that the Trust bought from Lubin his contract with Pryor and Lockhart for the purchase of 42% of the stock of Pryor and Lockhart, Inc., and certain other productive and wildcat properties and agreed to issue therefor $340,000 in Kansas notes; that the properties acquired from Lubin were and are still valuable; that Yingling acquired an option to purchase the Case-Pomeroy properties and sold the option to the Trust, reserving certain overriding royalties; that Lubin received no interest in the overriding royalties and oil payments reserved; that the money to purchase the Case-Pomeroy properties, $1,250,000 was obtained, with the help of Yingling, from Sohio, that out of the proceeds of this loan, a prior and existing mortgage of $300,000 was satisfied and the balance of $950,000 paid upon the purchase price; that this necessitated borrowing an addi-

tional $300,000 which Lubin procured from personal friends and caused to be paid direct to the vendor.

With respect to the sale of ⅞ths of the Trust's interest in the Case-Pomeroy properties, defendants aver that on June 1, 1944, Valley Oil Corporation proposed to purchase the ⅞ths interest, not including 5000 acres of wildcat leases, for $985,000, to be represented by the assumption of indebtedness owing Sohio and the surrender of $260,000 of obligations owing by the Trust; that Lubin was also to help refinance certain outstanding obligations of the Trust of $155,000. They further aver that the purchase was to be subject to a primary overriding royalty of 1/32nd, a secondary overriding royalty of 1/32nd, 1/16th of the net remaining interest until the sum of $200,000 was paid and 5¢ per barrel on the production from the remaining interest for a term of years.

Defendants aver also that there was an excess of expenditures on the property in June and July, 1944, over the income and that Lubin has been compelled to furnish funds to make up deficiencies and to operate the property; that in all the transactions the trust received a fair and adequate consideration; that all the deals were on a sound business basis; that the interests transferred produced less than 40% of the total income; that all the transactions should be approved and the complaint dismissed.

The annals of Lubin and the Trust and their relationship, one with the other, so far as this record is concerned, had their genesis in the National Petroleum Corporation of which Lubin, according to its prospectus, was parent and promoter. Lubin's brokerage firm, Presser & Lubin, was the underwriter of its securities, until enjoined, at the suit of the Attorney General of New York, from dealing in oil securities, leases or interests. The properties held by the National Petroleum Corporation found their way into the Transcontinental Petroleum Corporation, with which, too, Lubin was intimately concerned and from Transcontinental, in turn, into the Trust. Again, we find an organization in intimate relationship with Lubin.

Creation of the Trust followed the injunction against Presser & Lubin. Lubin himself tells us that of the shares of the Trust, over and above those issued to Clear Creek, 250,000 passed to persons whom he designated, in return for property transferred to the Trust by such persons or by himself. For all intents and purposes Lubin was the moving spirit of the undertaking, bringing together the creators of the Trust, suggesting the original Trustee and, when that one resigned, nominating his successor and, still later, when the Trustee Pryor resigned in order that he might purchase the 58% of the Pryor and Lockhart, Inc., stock held by the Trust, Lubin, it was, who seriously urged Clear Creek to send in its proxy in order to elect Greenlaw as Trustee.

It is impossible to read this record without finding that from the inception of the Trust until the present day, the originator, the entrepeneur, the promoter, the heart and soul of the Trust, as well as of its predecessor organizations, was Herbert Lubin. In substantially all its transactions, his controlling, manipulating hand was active behind the scene, and in every sale or acquisition of property, he eventually turned up with some bonus, some free royalty or some property interest. He boasted openly that the Trust was his idea or, as he said, "his baby"; that he intended to see it "grow up" and that, rather than be one of its officers, he preferred to be the "power behind the throne." Exemplification of his active interest appears in his preparation and exhibition of a moving picture history of the Trust activities, in his printing an elaborate booklet illustrating the properties of the Trust, his provision of lavish food, drink, music and entertainment for the shareholders, his distribution of a pamphlet elaborating upon the future program of the Trust bearing the legend "Herbert Lubin's Presentation." He was at all times fully and intimately informed as to and actively participating in all affairs of the Trust; the directors relied upon him implicitly for advice; he gave instructions to employees of the Trust; he wrote letters upon its stationery; he inevitably determined its policies and managed to have them carried out. He announced that if anyone wished to deal with the Trust they must do so through him. When complications arose, he assured shareholders that he would get the difficulties "straightened out"; and it stands without dispute that not only did the successive trustees and members of the Trust Committee go to him for advice, but that they relied upon his suggestions, upon his counsel, and inevitably did that which he suggested or requested done.

I shall not attempt to review in detail the multitudinous facts and circumstances in the record but, taken in connection with what I have related and with the inevitable inferences which one must draw from all the circumstances, they constitute convincing proof that, from the inception of the Trust, Lubin occupied the trust position of promoter, director, and entrepeneur of a corporation and that his influence over the members of the Trust Committee was so great that the latter gave to him such credence, such faith and such reliance as to render them his supine, willing tools and as to charge him with all the obligations of a fiduciary whose transactions with the Trust must be scrutinized with great care to determine whether he has realized property, profit or advantages in violation of his obligation to his cestui que trusts and in violation of the trust and credence placed in him by the managerial and executive officers of the Trust, at the expense of the shareholders, and to determine whether his transactions have been such as will stand the light of day in a court of equity, in other words, whether he has violated obligations owing the Trust and its shareholders within the doctrine announced by the courts in largely similar situations. I shall not quote from the many authorities but refer to the following as fully exemplificative: 18 C.J.S., Corporations, §§ 147, 160, pp. 548 to 559; Jackson v. Smith, 254 U.S. 586, 41 S.Ct. 200, 65 L.Ed. 418; Davis v. Las Ovas Co., 227 U.S. 80, 33 S.Ct. 197, 57 L.Ed. 426; Dickerman v. Northern Trust Co., 176 U.S. 181, 20 S. Ct. 311, 44 L.Ed. 423; Tilden et al. v. Barber et al., D.C., 268 F. 587; Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425; McCandless, Rec., v. Furlaud, 295 U.S. 140, 56 S.Ct. 41, 80 L.Ed. 121; Noble v. Noble, 255 Ill. 629, 99 N.E. 631; Dixmoor Golf Club, Inc., v. Evans, 325 Ill. 612, 156 N.E. 785; Eichhorst v. Eichhorst, 338 Ill. 185, 170 N.E. 269; Staufenbiel v. Staufenbiel, 388 Ill. 511, 58 N.E.2d 569; Goodwin v. Wilbur, 104 Ill.App. 45; In re Marquette Manor Bldg. Corp., 7 Cir., 97 F.2d 733; Wendt v. Fischer, 243 N.Y. 439, 154 N.E. 303.; Irving Trust Co. v. Deutsch, 2 Cir., 73 F.2d 121.

The Supreme Court of Illinois has gone so far as to place upon the fiduciary the burden of proving validity of transfers attacked. Thus, in Staufenbiel v. Staufenbiel, supra, 388 Ill. at pages 522 and 523, 58 N.E.2d at page 574, the court said: "When a fiduciary relationship is established, the burden is on the one profiting by the transfer of property to show that it was procured fairly and without the exercise of undue influence. If such relationship existed at the time of the transfers, then the transactions are deemed to be presumptively fraudulent and will be set aside, unless the one in whom the confidence and trust was reposed establishes their fairness by clear and convincing proof. Fisher v. Burgiel, 382 Ill. 42, 46 N.E.2d 380; Children's Home of Rockford v. Andress, 380 Ill. 452, 44 N.E.2d 437; Seely v. Rowe, 370 Ill. 336, 18 N.E.2d 874; Mors v. Peterson, 261 Ill. 532, 104 N.E. 216; Thomas v. Whitney, 186 Ill. 225, 57 N.E. 808." To the same effect are Vrooman v. Hawbaker, 387 Ill. 428, 56 N.E.2d 623; Doner v. Phoenix Joint Stock Land Bank, 381 Ill. 106, 45 N.E.2d 20; Quist v. Dorn, 301 Ill.App. 264, 22 N.E.2d 729.

Early in its history, the Trust purchased 58% of the stock of Pryor and Lockhart, Inc., the remaining 42% being retained by the two men whose names appear in the firm, Pryor and Lockhart, both of whom were well known to Lubin, Mackenzie, the Trustee, and Greenlaw, the later Trustee. Having acquired this 58%, the Trust may well have thought it advisable that it purchase the remaining 42%. But the record discloses not the slightest reason why the Trust should not have approached the officers of the corporation in which it held a 58% interest, if it desired to purchase the remainder. Yet we find that Lubin first made a contract with Pryor for the purchase of the 42% at a cost of $250,000 payable, strangely enough, in securities of the Trust, which Lubin contracted to deliver to the vendors. Shortly later, Lubin contracted with Mackenzie as trustee to sell to the Trust the 42% interest, not at what he had agreed to purchase it from Pryor and Lockhart, but for $341,000 in addition to the original purchase price. In other words, for the assignment of the contract, the Trust agreed to pay not only the $250,000 which Lubin had agreed to deliver to Pryor and Lockhart, but, in addition, $341,000 in notes of the company, as additional consideration to Lubin. Some proved territory and some wildcat territory were included in this assignment by Lubin, but the Trust never examined these additional

properties. It had no appraisement made and consulted no third person concerning them. It relied entirely upon the representations of Lubin, accepted his valuation and delivered to him the $341,000 in notes, all without consulting the shareholders and all as result of the unconfirmed suggestion of Lubin. The circumstances surrounding this transaction were such that no impartial person can say other than that there was no dealing at arms' length but rather crude over-reaching by the man who claimed the Trust was his creature. He could not, in that situation, under the authorities, legally sell the Trust anything except upon an arms' length basis and after objective impersonal determination of adequacy of valuation. From all the circumstances in the record I must hold that the notes for $341,000 were received by Lubin in violation of all his trust duties, as a promoter or as a fiduciary and that they were, in his hands, void at the suit of the Trust or its shareholders.

Lubin insists that this was an ordinary business transaction, because, in addition to turning over the contract with Pryor and Lockhart, he included additional leases. It is doubtful if these properties, which had no connection with Pryor and Lockhart, Inc., had any established market value at that time or anything more than a small speculative value. At any rate they were not such properties as would justify a fiduciary in Lubin's position in unloading them upon the shareholders at this grossly overstated valuation. The whole transaction is so tainted with fraud, so stained with the wrongful, grasping greed of a promoter and faithless fiduciary, leading to his undue enrichment, that I must rescind it.

A sorry day, indeed, it was for the Trust when these notes were issued. No adequate consideration was received for them. The 42% was never paid for, never received and the notes issued, from that time on, constantly were in the hands of persons to whom Lubin transferred or sold them with resulting plaguing and harassing of the Trust and upsetting and destroying its financial well being. Not only did Lubin deceive the shareholders in this manner but later $260,000 of these and similar notes turn up as the only actual consideration delivered by him for the most valuable asset of the Trust.

I am convinced that Lubin must account to the Trust for the entire Kansas note issue of $341,000. Obviously, if the properties be conveyed to the Trust at the time he assigned the contract to purchase the 42% of Pryor and Lockhart, Inc., had any value they should be returned to him or he should be credited with their value. Under the evidence I find the fair cash market value of the producing properties that he delivered to the Trust at the time of the transaction was not in excess of $65,000. The Trust must either return these properties to him or credit him with the sum of $65,000. There is no evidence that the nonproducing properties had any market or other value. But, inasmuch as they were transferred to the Trust, they should be reconveyed to Lubin or their value, if any can be shown, credited against the $341,000 note issue. The Kansas notes surrendered by Lubin at the time he later purchased an interest in the Case-Pomeroy properties I shall discuss later in this memorandum.

While negotiation of the contract by Lubin for the purchase of 42% of Pryor and Lockhart, Inc., was pending and during the period when its assignment to the Trust was being perfected, resulting in the issue of the $341,000 in Kansas notes, Yingling, who was well known to the officers of the Trust, was negotiating for an option on the valuable Case-Pomeroy properties, and in July, 1943, he submitted to the Trust, an option which he had procured, stating that he desired to retain a 1/32nd overriding royalty, in consideration of his turning the option over to the Trust. The Trust accepted and took an assignment of the option. The purchase price was $1,250,000. To obtain the money, the Trust mortgaged to Sohio all its property in Indiana and Illinois for $1,210,000 and borrowed also an additional $300,000, $100,000 from Albert, father-in-law of Lubin, upon its Louisiana and Texas properties and $200,000 by issuing notes known as the Illinois notes. Later the Texas and Louisiana properties were sold at a substantial loss, the net proceeds being used to pay the notes held by Albert. Out of the money borrowed from Sohio the Trust paid off an existing mortgage of $300,000.

When the contract of sale was completed, however, we find that after the Trust received the property, it issued a 1/32nd overriding royalty on all the Case-Pomeroy properties except the Heil lease, to Yingling; 1/32nd overriding royalty on all property except the Heil lease to Barney Lubin, one $25,000 oil payment out of the production from the Heil lease to Ying-

ling; a like oil payment out of the same lease to Barney Lubin; a $200,000 oil payment out of the net 1/16th of the working interest, except the Heil lease, to Barney Lubin and a reservation of 5¢ a barrel, payable to Barney Lubin, on the net production accruing to the Trust upon all the Case-Pomeroy properties for ten years. Defendants claim that these cost free burdens were in existence at the time of the purchase of Yingling's option, but the evidence confirms only the existence of an agreement to deliver to Yingling his cost free burden in consideration of his assigning the option. There is no evidence that Barney Lubin rendered any service and, indeed, it follows, I think, from the testimony of Herbert Lubin himself, despite his statement in his answer to the contrary that all interests that Barney Lubin ever had always belonged to him, Herbert Lubin, and that he used the name of his brother, Barney Lubin, for the reception of interests which were entirely his. At any rate, Barney Lubin, a defendant, has produced no evidence of any substantial service rendered by him or by Herbert Lubin in securing the Case-Pomeroy properties. Yet we find delivered to Barney Lubin, for the benefit of Herbert Lubin and, so far as the record shows, as his sole property, 1/32nd cost free overriding royalty in all the Case-Pomeroy properties except the Heil lease; $25,000 cost free oil payment out of the Heil lease; $200,000 cost free oil payment out of all the property except the Heil lease and 5¢ per barrel on all the production from all the Case-Pomeroy properties for ten years, all of a value of probably over $300,000.

As I have said, defendants insist that these overriding royalties and oil payments were burdens upon the property when the Trust secured it, but the evidence is that they were never created by formal instrument until after the Trust secured the property, and, for some unexplained reason, the instruments executed by the Trust conveying them were not placed on record until the following year, April, May or June, 1944. Nor did the letter to the shareholders, in which the management of the Trust praised itself for securing the Case-Pomeroy properties, advise the shareholders that there were any cost free overrides and oil payments outstanding. Nor do the records of the Trust themselves disclose the fact that these payments were to go to Lubin, who had furnished no consideration for them.

I find nothing to impeach the interest reserved by Yingling. Apparently he obtained in his own right a valuable option, and the evidence does not indicate that the consideration which he received for its assignment was unreasonable or extravagant. But as to the remaining overrides, taken in the name of Barney Lubin and belonging to Herbert Lubin, quite a different situation exists. The evidence is silent as to any reason why Lubin should have had anything. He was not a party to the option or its assignment and so stated in his answer; he had no interest in it, and he rendered no service justifying issuance to him of cost free interests worth $300,000. Whether the management of the Trust was unappreciative of its obligations to the shareholders and sadly negligent or whether it blindly and implicitly relied upon the person who claimed to be the power beyond the throne and, supinely, at his suggestion and under his persuasion, issued to him these cost free interests, it is difficult to determine. I prefer to believe, not that they were not aware of their trust obligations and woefully failed to discharge them but rather that they were lacking in alertness and fell prey to the influence of a man who had been so intimately connected with the creation of the Trust and its predecessor companies and who had been so active in all the transactions of the Trust that he was, as I have said, in such a position as to necessitate the closest scrutiny upon his acts in so far as they affected the Trust. I find and conclude that the assignments of the cost free interests to Barney Lubin must be cancelled and set aside and the moneys received upon them accounted for by Herbert Lubin to the Trust.

No reason appears for the intervention of Lubin in this transaction. Yingling and Greenlaw were well acquainted and intimately associatted; Greenlaw testified that he rarely made any important move in the management of the Trust's affairs without seeking the advice of Yingling. Pryor, the Trustee, also was well acquainted with Yingling. All in all, there is complete absence of reason why the Trust could not deal directly with Yingling in procuring the properties and, indeed, that is what defendants in their answer said happened. Lubin testified that he never informed the Trust Committee that he had any interest in Yingling's option. As a matter of fact Barney Lubin was always spoken of as a nominee

of Yingling and though, in the resolutions of the Trust Committee, the cost free interests are referred to, it is not disclosed that either of the Lubins had any interest therein. Furthermore, because of the reasons heretofore advanced, if Lubin acquired a secret profit, he can not be permitted to retain it.

It is asserted by defendants that consideration for the existence of the cost free interests in Lubin arises from the fact that he helped obtain a loan of part of the money with which the Trust purchased the property, but the record is silent as to any evidence that the cost free interest was treated as a consideration for procuring any of the funds. And, if it were, Lubin can not take it as against the shareholders. As a matter of fact the record discloses that eventually the Trust paid Lubin $10,000 purportedly for procuration of funds.

The purchase of the Case-Pomeroy property occurred in mid-summer 1943. Within less than a year Lubin proposed to Greenlaw that he, Lubin, buy the Case-Pomeroy properties. Largely because of the Pryor and Lockhart affair the Trust had, despite a large income, become involved financially, it had applied to R.F.C. for a loan without success. It made no attempt to sell the property to anybody else, no attempt to refinance through Sohio, whose mortgage had been greatly reduced by proceeds from oil, and no search for other sources of refinance. Again the Trust management subserviently followed the lead of Lubin who, in the name of the Valley Oil Company, was given a contract to purchase ⅞ths of the Case-Pomeroy properties. Valley, too, was Lubin's creature. He organized it and he alone was responsible for all of its acts. It was a paper corporation, without assets of any character and as soon as it had secured the property, it transferred the same to Lubin. Why it was necessary for the transfer to pass to a corporation without assets and then immediately to Lubin is wholly unexplained. A legitimate inference, I think, is that, had the shareholders known that this valuable property was to go to Lubin, they might well have raised valid objection, and prevented the transfer to Lubin. Neither Valley nor Lubin paid any cash consideration to the Trust. Both assumed and agreed to pay a proportionate share of the unpaid balance of the Sohio mortgage. But the promises were of no value; neither had funds, property or bank account. Lubin was in debt to the extent of at least two unsatisfied judgments for substantial amounts of record against him. No release was obtained at that time of the Trust's obligation to pay any part of the mortgage. Sohio obtained a new worthless promise but did not release the old one. In addition, Lubin undertook to obtain and surrender to the Trust $260,000 of its outstanding notes. These were in part the Kansas notes originally received by Lubin at the time of the contract to buy 42% of Pryor and Lockhart, Inc. He had disposed of some or all of these and managed to reacquire some of them. They were, as we have seen, issued without consideration and, under such circumstances, in the hands of Lubin, void. In so far as the surrender of these notes entered into a consideration for the purchase of ⅞ths interest of the Case-Pomeroy properties there was no consideration for the sale. However, inasmuch as they were returned to the Trust, they should be credited to Lubin as against the sum of $341,000 in Kansas notes issued to him which I have directed he should account for.

The total, $260,000, was paid by surrender of: (1) Kansas notes, principal $181,000; interest $10,860, total $191,860; (2) Illinois notes, $32,700; interest $1,962, total $34,662; (3) unsecured notes belonging to Greenlaw, $32,500; interest $1,399.17, total $33,899.17; grand total, principal and interest $260,421.17. The excess of $421.17 was credited on the books of the Trust against operation charges. Thus of the total of $260,000, $191,860 consisted of Kansas notes turned over to the Trust by Lubin, all of which were void in his hands. The validity of the balance, consisting of Illinois notes of $32,700 and Greenlaw's unsecured notes $32,500 plus the interest thereon, I do not consider impeached by the record.

■ My conclusion is that the transaction was not a fair and open one at arms' length but one again in which Lubin, by the exercise of what seems to have been most powerful persuasive influence, to say the least, upon the executive management of the Trust, through a fictitious corporation, through the surrender of almost $200,000 in fictitious paper and without consideration other than a worthless promise to pay, from the oil produced, a proportionate share of the Sohio mortgage debt, secured title to this valuable property producing some $300,000 per year upon surrender of $65,400 in notes and the interest due

thereon. As a promoter, the force behind the official organization of the Trust, Lubin was under an obligation to deal fairly, openly and at arms' length with the Trust and its shareholders, and, inasmuch as he failed to do so, the transaction must be set aside.

When the transfer is rescinded, Lubin is entitled to credit against the Kansas notes not only for those he redelivered but also to the amount of the valid notes of $65,400 he likewise surrendered, namely, the Illinois notes and the unsecured notes of Greenlaw. He can not be credited with any interest on the Kansas notes, but will be credited with the principal and interest of the other notes.

But this was not the end of the transactions between Lubin and the Trust. Within a few months a new one occurred, whereby, as of January 1, 1945, the Trust transferred to Lubin ⅛th of the Helm A. lease and Lubin to the Trust ⅞ths of all Case-Pomeroy properties other than the Helm A. lease. While the items were entered upon the books as of January 1, 1945, they resulted from a Trust resolution of February 13, 1945. The entries must have been dated back. But nothing occurred in this transaction which alters in any way the nature of the original transaction or the conclusions that I have reached.

■ The Trust Indenture contains a provision that the Committee shall not transfer or assign any property belonging to the Trust, the income of which amounts to 40% of its total income. Figures have been submitted as to the proportion to the entire income of the Trust, the income from the ⅞ths of the Case-Pomeroy properties and that of the income of the Helm A. lease bear. These calculations have been made upon both the income free of all cost free burdens and the income when such burdens are deducted. However, no figures have been submitted which disclose satisfactorily what proportion of the total income the Case-Pomeroy income would represent if the properties were freed of the cost free burdens in the name of Barney Lubin and held by him for Herbert Lubin. It is obvious, however, that the income from the ⅞ths and the income from the Helm A. lease, free of the Lubin cost free burdens, have each from time to time, represented more than 40%. It is doubtful whether they represented more than 40% prior to the date of the purchase. In this connection I might ob-

serve that, while the books of the company represent an attempt to set up a transfer to Lubin in June, 1944, the sale was not completed for some time thereafter. The figures supplied indicate, I think, that within the period during which the contract was pending, the percentage of income received from the property, when Lubin's cost free burdens are excluded, would be more than 40% of the total income of the Trust and, if this be true, inasmuch as no notice was given to the shareholders, the transfer unauthorized in view of the provision of the Trust Indenture.

If I be in error as to this computation, which I am unable to make satisfactorily to myself, the result would not be changed. The relationship of Lubin to the Trust, the confidence which the Committee exhibited in and bestowed upon Lubin and which he betrayed, the failure of the Trustee and members of the Trust Committee to advise the shareholders of such an important matter, the concealment from the shareholders of the cost free interests given Lubin, the void issue of $341,000 in Kansas notes to Lubin, and all of the other facts and circumstances appearing in this record, are sufficient, as I have found, to invalidate the sale. All of the circumstances, I say, are such that, at all events, irrespective of whether the income received by Lubin was in fact 40% of the total income, the transaction must be rescinded.

■ Plaintiffs seek relief also against the Trustee and the members of the Committee. I think the evidence too scant to justify a finding that they have been guilty of fraud. Their management was grossly careless, but I think I am not justified in saying that their bad business judgment, in handling speculative oil properties in proved, wildcat and unproved territory amounts to fraud. The results were disastrous. Indeed, before rescission of any of these transactions, the books of the Trust reflect a loss of $1,486,385.38 between September 1, 1943 and May 31, 1944, if we accept the Trust's depletion and depreciation figures. In the same period the Trust's monthly income declined from $81,068.42 to $32,308.39. I believe, however, from what I have seen and heard in this hearing that the Committee was not made up of dishonest men but rather of men of integrity, who, mistakenly and with poor judgment, came to rely upon a man who looked upon the Trust as "his baby," accepted without consideration any

and all suggestions that he made and were betrayed by him. True, Pryor became trustee immediately after the contract was signed for the purchase of 42% interest in his corporation. Then he resigned just before the Trust resold to Pryor and Lockhart, its 58% in the same corporation. Truly, such evidence does not reflect a keen appreciation of the fiduciary obligations of a trustee. And true it is that in the last three years the Trust has managed to put itself in a thoroughly unhealthy financial condition. But that result is due, as I interpret the record, to the treachery and manipulation of Lubin, without conscious malfeasance upon the part of the other defendants. Some circumstances excite grave suspicion but the evidence is insufficient, to my thinking, to prove fraud upon the part of the Trust or the members of the Committee satisfactorily or to the extent and with that strictness ordinarily required in fraud cases.

Lubin, I find, artfully planned every step he took from the time of the existence of the prior corporations and in the organization of this Trust as their successor. The evidence reflects his domination of each corporation, negotiations with persons to form a trust, his naming of the trust committee, his suggestion of a trustee and his controlling activity generally in all matters pertaining to the Trust. This all reflects one concerted plan, out of which, as a result of all the transactions, we find him the owner of the most valuable asset of the Trust without delivery of adequate consideration.

■ Lubin shall account in the manner I have directed. I find further that the Trust advanced between June 1, 1944, and December 31 the same year, Lubin's portion of the operating costs of the Case-Pomeroy properties, overpaying him $71,156.43. To reimburse the Trust for the overpayment he delivered Kansas notes for $12,000 plus interest thereon of $720 or $12,720; Illinois notes and interest $15,370 and received credit for $421.17 overpayment of $421.17 on the purchase price of $60,000 for the ⅞ths interest. He also paid the Trust $645.26 in cash. The credit for the Kansas note $12,700 must be eliminated. Consequently he owed the Trust $54,720. Of this debt the Trust wrongfully forgave Lubin $42,000. I find nothing in the subsequent transactions to justify elimination of the total balance of $54,720 indebtedness in this respect. In view of the fact that all of the contracts with regard to ⅞ths and Helm A. lease are rescinded, nothing can grow out of the action of the Trust in accepting the Kansas note for $12,700 or for cancelling $42,000. Much is said of services rendered by Lubin in procuring loans for the company but each step he took in this respect redounded eventually to his own benefit and not to that of the Trust. Moreover, the situation was that he could not legitimately charge a commission. Thus, upon an accounting for that period, he would clearly owe the Trust $42,000 plus $12,720 in Kansas notes or a total of $54,720.

■ In addition, because of rescission, he must account for the expenditure of the sums he has received from the property $183,926 in the period mentioned and remains liable to show that he expended it for the benefit of the Trust. He must account for all receipts since December 31, 1943. He will be credited for such expenditures as he shows have been made for the benefit of the Trust and charged with all other receipts.

The Trust sold its 58% in Pryor and Lockhart for $250,000. It had previously contracted to pay more than twice that amount for 42% and it had originally paid very much more for the 58% interest. But I feel that nothing contained in this record justifies rescission of the sale of the 58% and that I have no jurisdiction of the parties necessary to such rescission despite the resulting tremendous loss. I find only a picture of poor business judgment at the most.

Another record fact deserves comment. When the Trust and Lubin were sued, the same solicitor answered for each of them and for Lubin's paper corporation, Valley Oil Corporation. Lubin insisted that all his transactions with the Trust had been in good faith and the Trust affirmed the truth of his averments. This circumstance reflects a lack of proper appreciation upon the part of the Trust of its obligation to present its case free of any association with a man whom plaintiffs were accusing of defrauding it and its shareholders. This, too, was surely poor judgment. The Trust Committee should have seen that it should seek independent counsel. It does not follow, however, that the solicitor who appeared for Lubin at that time was wrongfully at fault. Apparently, before the trial, he did not fully appreciate the fact that there might develop a conflict between

Lubin and the legal representatives of the Trust and that the ethical proprieties demanded separate representation. At the trial the Trust was represented by other counsel, but even then the Trust took the position that the transactions should be approved rather than rescinded. I have no doubt that counsel acted upon what he was told by the members of the Trust Committee. But they had been so long under the dominion of Lubin that he had their utter confidence. An advocate, I take it, is justified in taking the word of his clients until he learns better. But at the end of the trial, the court has approved in part the complaint of shareholders seeking to enforce the rights of the Trust where the Trust has failed to do so. The court has now determined that the Trust and its shareholders have been imposed upon, misled and deceived to their serious injury and I have no doubt that the Trust's further actions will reflect the soundness of the court's conclusion and that it will disaffirm its alliance with Lubin, its allegiance to him and its reliance upon him and conduct its affairs from the point of view of the well-being of the Trust, uninfluenced by his association or suggestions.

The complaint prays for a receiver, but I am loath to take the properties from the parties and put them in the hands of a court official and shall do so only as final resort necessary for the protection of creditors and shareholders. In the absence of a finding of fraudulent conduct upon the part of the Trust Committee and believing that past misfortunes have been due entirely to the manipulations of Lubin, I shall not at this time take the property from the custody of the Trust but shall reserve action on the prayer for a receiver.

Since the transfer of the Helm A. lease to Lubin, he has placed upon the property additional mortgages to Swann as Trustee. The beneficiaries of those mortgages are not all before me. I can not adjudicate in favor of plaintiffs as against them. I can only comment that, in view of the record, any money loaned in good faith to Lubin on these mortgages must stand as a valid lien against the Trust and the shareholders, but whether Lubin has received the proceeds of such loans and expended them upon the property or for his own purpose is another matter not now determined. In the absence of conclusive proof at this time upon this branch of the case, I take no action with reference thereto except to say that Lubin shall render full account with reference thereto.

All parties have admitted the good faith and integrity of the mortgages of Sohio. They are valid and enforcible according to their terms. Sohio has no interest in the controversy other than to protect its liens. The decree herein will provide such full protection.

There are other matters in this voluminous record which, in view of my stated conclusions, I have not thought it necessary to discuss.

There will be a decree rescinding the issuance of the Kansas notes, in so far as Lubin is concerned. He shall account for the entire issue of $341,000 and be credited for such of them as he has surrendered. There will be a rescission of the sale of 7/8ths interest in the Case-Pomeroy properties and of the Helm A. lease to Valley and to Lubin and he shall be credited with the consideration he delivered over and above the Kansas notes. He shall account for the balance due from him to the Trust as above stated for the period ending January 31, 1944. He shall account for all moneys paid to himself or to Barney Lubin upon the cost free burdens on the Case-Pomeroy properties and all of said rights are cancelled. He shall account for $10,000 purported commission for obtaining loans as mentioned above, and for any and all of the proceeds of the production received from the 7/8ths interest in the Case-Pomeroy properties and from the Helm A. lease and from the mortgages placed thereon and be credited with such expenditures as he has made for the preservation, operation or betterment of the Trust's interest in those leases. He and Valley shall, within ten days, execute a conveyance conveying that property to the Trust and if he does not voluntarily account in the manner aforesaid, this court will set the matter for hearing or refer the same to a master as circumstances may require.

The foregoing memorandum supplements my findings and conclusions and is made a part thereof. There is no question as to jurisdiction of the parties or of the subject matter.

Proper draft of judgment shall be submitted.